**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Miguel Luis Alba FERNANDEZ,
Defendant-Appellant.**

**No. 73-1446.**

United States Court of Appeals,
Fifth Circuit.

June 28, 1974.

Joseph A. Calamia, El Paso, Tex. (Court-appointed), for defendant-appellant.

William S. Sessions, U. S. Atty., San Antonio, Tex., Edward S. Marquez, Asst. U. S. Atty., El Paso, Tex., for plaintiff-appellee.

ap

Before THORNBERRY, SIMPSON and CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

Fernandez appeals from his conviction before a jury, judgment and sentence under six counts of a nine-count indictment charging him with possessing, forging and uttering three United States Treasury checks allegedly stolen from the United States mails. He alleges as error: (i) the failure of the trial judge to charge the jury as to the presumption of innocence; (ii) prejudicial comments made by the prosecuting attorney in final argument concerning appellant's prior criminal record and the failure of the trial judge to give limiting instructions as to the proper use of this evidence by the jury, and (iii) the lack of sufficient evidence to support conviction as to Counts 7, 8 and 9 involving one of the checks allegedly possessed, forged and uttered. Finally the jurisdiction of the federal courts to entertain the case is challenged because the crimes, if committed at all, took place outside the territorial jurisdiction of the United States, in Juarez, Chihuahua, Mexico.

We determine that the court had jurisdiction to try appellant's case, but find that reversible error occurred below when the trial judge failed sufficiently to instruct the jury as to the presumption of innocence in the special circumstances of this trial involving the jury argument. In view of our remand, we do not discuss the sufficiency of the evidence.

## I. FACTUAL BACKGROUND

In view of the questions raised a factual summary is necessary. In June and August, 1971, Social Security checks drawn on the U. S. Treasury payable to Maximo Garcia, Lynn D. Hay, and Librado Castillo failed to reach the payees at their addresses in El Paso, Texas, all within a six block area on Wyoming Street. The mailing of the checks was stipulated at trial. Testimony of the individual payees established that the checks were never received by them. It appeared from the endorsements, stamps, and other evidence, that the checks had been negotiated in Juarez, Mexico, directly across the International Boundary, the Rio Grande River, from El Paso, by individual(s) posing as the payees. Leads developed focusing the investigation on the appellant, Miguel Luis Alba Fernandez, and another. In June 1972, a nine-count indictment charging the appellant with (a) possessing,[1] (b) forging and (c) uttering[2] the three checks was returned by a Western District of Texas grand jury at El Paso, Texas. Counts 1, 2 and 3, respectively, charged that the appellant had possessed, forged and uttered a Treasury check made payable to Maximo Garcia. Similarly, Counts 4, 5 and 6 charged Fernandez with possessing, forging and uttering a Treasury check payable to Lynn D. Hay, and Counts 7, 8, and 9, respectively, charged him with possessing, forging and uttering a Treasury check payable to Librado Castillo. All the criminal acts involved were alleged to have been committed in Juarez, Chihuahua, Mexico, during June and August of 1971 by Fernandez, "whose last known residence is within the Western District of Texas".

At trial, the government introduced testimony of a clerk from a Juarez shoe store that she had personally cashed the Maximo Garcia check, and that the appellant presented the check to her and endorsed it in her presence. A government witness, a fingerprint identification expert, testified that a fingerprint matching appellant's was present on the Librado Castillo check. A handwriting expert testified for the government that the endorsements on the Lynn D. Hay and Librado Castillo checks were probably—though not certainly—made by the appellant. The appellant testified in his own behalf and denied that he had ever been in possession of any of the three checks forming the basis of the indictment. He stated that he had resided in the United States since a year before he

---

1. In violation of Title 18, U.S.C., § 1708.

2. In violation of Title 18, U.S.C., § 495.

entered the United States Army in 1964. The jury returned a verdict finding the appellant guilty on Counts 1 through 3 (Garcia check) and 7 through 9 (Castillo check), and not guilty on Counts 4 through 6 (Hay check).

## II. JURISDICTION

■ Our first consideration is addressed to the claim of lack of jurisdiction below over the offenses charged. The appellant's timely motion to dismiss the indictment for lack of jurisdiction was denied prior to trial. He renews the attack here that the courts of the United States lack jurisdiction to try him for criminal acts charged to have taken place in Juarez, Mexico, and not in the United States. The point is lacking in substance. Under the theory of objective territorial jurisdiction, the court below had the right to charge and try Fernandez for the indictment offenses. This theory originated in Strassheim v. Dailey, 1911, 211 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735, 738, where the Court held, per Mr. Justice Holmes: "Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of harm as if he had been present at the effect, if the state should succeed in getting him within its power." We followed *Strassheim* in Rivard v. United States, 5 Cir. 1967, 375 F.2d 882, 887, cert. denied sub nom. Groleau v. United States, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181. The theory is applicable to this case.

The case law makes clear that the alleged acts of possessing, forging and uttering the Garcia and Castillo checks in Juarez were acts "intended to produce and producing detrimental effects within [the United States]," specifically preventing the normal disbursement of Social Security funds to those lawfully en-

titled to receive such funds. Cf. Leonard v. United States, 9 Cir. 1963, 324 F.2d 911, 913.[3]

## III. THE PRESUMPTION OF INNOCENCE

■ Prejudicial error is asserted by reason of the failure of the trial judge to inform the jury, in his final instructions or at any other point in the trial, that appellant was entitled to be presumed innocent until proven guilty beyond a reasonable doubt. The government contends that the court's very complete charges that proof must be beyond a reasonable doubt and defining reasonable doubt informed the jury in practical effect as to the presumption of innocence.

The court's instructions as to reasonable doubt included the following:

"In a criminal case such as this, there is absolutely no obligation for the Defendant to prove his innocence. The burden of proving his guilt upon any one of the nine counts in the indictment beyond a reasonable doubt rests on the prosecution. That burden never shifts and that burden cannot be sustained unless and until the proof offered by the government in the case convinces you beyond a reasonable doubt of the guilt of the defendant.

"Now, I'm required to define the words 'reasonable doubt'. By the term reasonable doubt which is used in this charge, I mean a doubt based upon reason arising out of the evidence or lack of evidence in the case. A reasonable doubt is such doubt as leaves the juror's mind so undecided that that juror does not have an abiding conviction of the Defendant's guilt after a full and fair consideration of all of the evidence in the case. A reasonable doubt is such doubt as would cause a reasonable, thoughtful and prudent person to hesitate to act if

---

3. See further the discussion of a similar theory of "protective jurisdiction" in United States v. Pizzarusso, 2 Cir. 1968, 388 F.2d 8, 10, cert. denied 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395.

confronted with a question of importance concerning his or her own affairs. On the other hand, reasonable doubt does not arise from a mere conjecture, speculation or whim, nor does it arise from a reluctance to convict a Defendant through a feeling of sympathy or mercy. A reasonable doubt is a conscientious belief arising only after a calm, dispassionate and impartial consideration of all of the evidence. It's not necessary for the Government to prove the guilt of the Defendant beyond all possible or conceivable doubt. If that were the rule, few persons however guilty they might be would ever be convicted. It is practically impossible for a person to be absolutely and completely convinced upon a fact, which, by its very nature, is not susceptible to exact and precise mathematical proof and certainty.

"In consequence therefore, the law is such that in a criminal case, it is sufficient that the Government or prosecution establish the Defendant's guilt on any count beyond a reasonable doubt, which I've defined reasonable doubt for you, rather than and not necessarily on all possible or conceivable doubt.

"It therefore becomes your duty to carefully consider all of the evidence before you, and if as a result of such evidence you can and do entertain a reasonable doubt as to the guilt of the accused on any one of these nine counts, then you should so find the Defendant innocent, and it will be your duty to give the benefit of the doubt to the Defendant in any case where you have such doubt. If, on the other hand, all of the evidence when carefully examined and considered by you produces in your mind a conviction or a belief of the guilt of the accused beyond a reasonable doubt, you can then be said to be free from reasonable doubt and should accordingly return a finding of guilty as to each count on which you have no reasonable doubt."

And again at the close of his instructions:

"Now, in summary and conclusion, if the Government has established each and all of the essential elements contained and charged in any one count in the grand jury indictment beyond a reasonable doubt, you should find the defendant guilty on that count. On the other hand, if you find that the government has not established or has failed to establish each and every one and all of the essential elements in any one of such counts of the indictment beyond a reasonable doubt as to the defendant, you should acquit the defendant and say so by your verdict of not guilty as to that particular count in the indictment which has not been proved beyond a reasonable doubt."

In addition, the trial judge instructed the jury that the indictment was not to be considered as evidence:

"You will have the indictment or a copy of it in the jury room with you. Bear in mind my previous instruction which I now give you again, the indictment is not evidence and must not be considered by you as such. The indictment is merely the means by which the grand jury brings the case before a court and jury so that it can be tried and you can hear the case and decide the issues."

No request to charge on presumption of innocence was made by the defense and no objection was raised, F.R.Crim. P., Rule 30, after the completion of the court's jury instructions, although opportunity was provided out of the jury's hearing to voice such objections. We deal with the sufficiency of the instructions as failing to include a specific charge on the presumption of innocence, therefore, in the light of the "plain error" limitation of Rule 52(b), F.R. Crim.P.

Our starting point is Coffin v. United States, 1895, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481, in which case the Court held that failure to give a *requested*

charge on presumption of innocence was not overcome by an adequate charge on burden of proof. The Court ruled that failure to give the requested charge was error requiring reversal. *Id.* at 461, 15 S.Ct. at 405, 39 ·L.Ed. at 494. This result was the outcome of a comprehensive analysis by the Court of the historical and logical foundations of our system of criminal jurisprudence. The Court postulated a logical relationship between the presumption of innocence and the burden of proof as follows: (i) the presumption of innocence is evidence to be considered in favor of the accused; (ii) because the accused comes into trial clothed with this presumption, it necessarily gives rise in the minds of the jurors to a reasonable doubt as to the guilt of the accused; (iii) therefore, the prosecution is charged with the burden of producing evidence that the accused is guilty beyond that reasonable doubt. This elaborate exposition was logical and perhaps sound and helpful as an abstract jurisprudential exercise. It had short life as an approved direction to trial juries.

The foundation of the holding in *Coffin*—the concept of the presumption of innocence as evidence to be considered in favor of the accused—was soon substantially eroded if not rejected completely by subsequent Supreme Court decisions in Agnew v. United States, 1897, 165 U. S. 36, 17 S.Ct. 235, 41 L.Ed. 624, and Holt v. United States, 1910, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021. Both cases affirmed refusal to instruct the jury in *Coffin* terms. In both cases, the trial court had instructed the jury on the presumption of innocence, though not in the exact language requested by trial counsel. The appeals each claimed error in the trial judge's refusal to instruct the jury to consider the presumption as evidence in favor of the accused. The Court held that such an instruction was unnecessary and at least potentially misleading. This Circuit and at least one other circuit have interpreted this

holding as negating the statement in *Coffin* that the presumption of innocence is evidence to be considered in favor of the accused. Harrell v. United States, 5 Cir. 1955, 220 F.2d 516, 522; United States v. Nimerick, 2 Cir. 1941, 118 F.2d 464, 467–468, 152 A.L.R. 620, cert. denied 313 U.S. 592, 61 S.Ct. 1117, 85 L.Ed. 1546. We have recently held that the presumption is definitely not evidence and that it was not error to refuse to instruct a jury that it is to be so considered. United States v. Thaxton, 5 Cir. 1973, 483 F.2d 1071, 1073.[4]

Of unimpaired vitality is at least the *Coffin* holding that it is prejudicial error not to instruct on the presumption when requested:

"The inevitable tendency to obscure the results of a truth, when the truth itself is forgotten or ignored, admonishes that the protection of so vital and fundamental a principle as the presumption of innocence be not denied, when requested, to any one accused of crime."

156 U.S. at 460–461, 15 S.Ct. at 405, 39 L.Ed. at 494.

In United States v. Thaxton, supra, at 1073, we followed this reasoning:

"The presumption of innocence performs a two-fold function in our criminal process. First, as a corollary to the. standard of proof in a criminal case, it serves to remind the jury that the prosecution bears the burden of persuading the factfinder of the defendant's guilt beyond a reasonable doubt and that in the absence of such proof that the jury must acquit. Second, 'it cautions the jury to put away from their minds all the suspicion that arises from the arrest, the indictment, and the arraignment, and to reach their conclusion solely from the legal evidence adduced.' 9 Wigmore on Evidence § 2511, at 407 (3d ed. 1940)."

We held in Helton v. United States, 5 Cir. 1956, 231 F.2d 654, that it was er-

---

4. Accord, 9 Wigmore on Evidence, § 2511, pp. 409–10 (3d Ed.1940).

ror to refuse to give a charge on the presumption of innocence when requested. We offered this advice very recently: "(T)rial judges should be careful to give the instruction on the presumption of innocence at the close of the case, so as to leave no room for controversy on this subject." United States v. Davila-Nater, 5 Cir. 1973, 474 F.2d 270, 285. We note finally, that one circuit at least has held that failure to give a charge on the presumption of innocence can rise to the level of plain error requiring reversal. McDonald v. United States, D.C. Cir. 1960, 284 F.2d 232.

Where does this leave us? Containing, as it did, the quoted careful language as to the government's burden of proof, and the defendant's right to remain silent, as to reasonable doubt, and further as to the limited function of an indictment at a trial, the jury instruction here covered fully the mechanical aspects of the procedure to be used by a jury in reaching a verdict. The sole missing element was the emphasis the stock presumption of innocence charge places upon the mental state required in approaching and evaluating the evidence against the accused. With the presumption of innocence charge *not requested* and its omission *not objected to*, we would be sorely tempted here to hold that plain error under Rule 52(b), F.R. Crim.P. is not made out, but for one aspect of the trial below which we find so critical as to mandate reversal for new trial. The problem is discussed in Part IV below.

## IV. PREJUDICIAL COMMENTS BY THE PROSECUTOR

We turn to another ground of error asserted by appellant: the prejudicial nature of the comments as to appellant's prior criminal record made by the prosecuting attorney in his final jury argument and the failure of the trial judge to give limiting instruction as to the proper function of this type of evidence.

When he took the stand in his own defense, Fernandez testified on direct examination in response to his own counsel's questions, that he had been convicted twice for shoplifting and once for possession of dangerous drugs. As the government points out on brief, these admitted convictions were not further explored on cross-examination.[5] No limiting instructions as to the evidentiary purpose of the proof of the prior convictions were requested and none were given. As pointed out, supra, the appellant offered no objection to the jury instructions at their close and made no request for additional instructions when invited to do so by the court in compliance with F.R.Crim.P., Rule 30.

The Assistant United States Attorney conducting the prosecution in his opening summation argued to the jury in these terms:

"Now, this is a serious case. Now, ladies and gentlemen, I brought into this court room three elderly people, people that throughout their lives have worked hard for whatever benefit they may receive from Social Security. They have worked all their lives, and now they are receiving their compensation. And I ask you, now by what right does this young man—now, he's only 27. Now, what right does this man have to go ahead and take those earnings and savings and compensation from people like Mrs. Hay and Mr. Hay who was too ill even to come to this court room today, or a man like Librado Castillo or Maximo Garcia.

"Now, this is what is involved in this particular case. Not just some government checks. It wouldn't matter what type of check it was. What is important is the people that were hurt. And they were hurt by Mr.

---

5. There was nothing left regarding this subject about which to cross-examine. The only legitimate purpose of such evidence being its consideration by the jury as affecting the defendant's credibility, defense counsel obviously brought the convictions to the jury's attention in the usual attempt to "soften the blow".

Fernandez who in the very prime of his life, 27 years of age, takes checks from people that are already retired. For what purpose? I don't know for what purpose? I do know that he has been involved in shoplifting and I know that he has been involved in narcotics and dangerous drugs. It may have been for that purpose.

"Now, these are the things we have to think about at the time that we are reviewing the evidence that was brought before you today.

"Now, we have in the Maximo Garcia check an eye witness, an eye witness. And I don't care what Mr. Fernandez says. I don't care what his attorney says. I believe that witness because she had no reason to come in here and tell you otherwise. If there is anybody in this courtroom that has any reason to lie, it's this man because he's the man that is standing trial, and he's got everything to lose and everything to gain by just coming in here and perhaps convincing just one of you that he was not responsible. Everything in the world."

And again:

"At least one of the series of three counts, of the Librado Castillo, he is guilty beyond a reasonable doubt because they found his finger print on that check.

"Now, if he bothered to take the stand—now, he doesn't have to testify at all, but he went ahead and bothered to take the stand and gave you a story about it was his girl friend in the store and this and that and he didn't do it, but did he ever bother to explain to you how his finger print ended up on the Librado Castillo check? And if he is going to try to make you believe that he is not guilty, then he should have at least had the decency to get up there and tell you the truth and explain to you the evidence that we did find. But he doesn't even have that.

"We found a thumb print on that check of Mr. Hay, the gentleman that is sick, too sick to come in here, and he didn't even—the Librado Castillo. I'm sorry. The elderly man that was hard of hearing. But where did you ever hear any explanation as to how his thumb print got on that check?

"THE DEFENDANT: You didn't ask me.

"MR. MARQUEZ: Where did you ever hear any explanation as to whether he worked in the bank? There is no evidence that Mr. Fernandez worked at any bank, that he ever handled that check working at the State National Bank or the El Paso National Bank. Never. And this is the type of man that takes the stand and tells you to believe what he has to say under oath."

And finally at the end of his opening argument:

"I don't know if counsel will answer the questions as to the finger print. He didn't try to during the trial. I doubt very seriously if he can at this time now during his argument. But this is the evidence. And it shows beyond a reasonable doubt that this man without any right, without any consideration for those people, took those checks for his own selfish purposes, to shoplift or to buy more drugs. I don't know. We know he has been involved with those problems before."

The argument was not interrupted by objection from defense counsel or by *sua sponte* admonition from the bench. The only interruption was the rather curious exchange with the defendant Fernandez quoted above regarding the presence of Fernandez's thumb print on the Librado Castillo check.

In response, defense counsel did not allude to his client's criminal record, nor did he attempt to answer the government's argument quoted above. He talked about reasonable doubt, the possibility of error in the identification of Fernandez by the young lady who cashed the Garcia check at the shoe store, Miss Flores-Chavez, the fallibility of both handwriting and fingerprint identifica-

tion testimony, and the serious danger of the jury's making a mistake and sending an innocent man to prison.

These arguments were all essentially variations on and paraphrases as to a single central theme; reasonable doubt and the presumption of innocence.

The prosecutor's rebuttal argument first undertook to answer the questions raised as to the thumb print identification. He proceeded to reply to the defense argument regarding handwriting identification, and the expert's inability to be positive as to the endorsement on the checks, by urging that Fernandez deliberately disguised his handwriting in furnishing exemplars:

"And now we made no bones about the testimony of the handwriting expert. I discussed that before. And I used it to go ahead and corroborate primarily the testimony of Scorro Flores Chavez [sic]. That was the purpose of that testimony. It'd be very nice to go ahead and have also positive handwriting, but the expert told you that Mr. Fernandez within the very specimens that he said he so eagerly cooperated to give has got many discrepancies. You will have this exhibit before you. Now, these are his handwriting specimens that he claims he voluntarily gave to the Secret Service. And yet you see that within the very specimen that he wrote, look at that G that he wrote, and then look at the G on the Garcia. He disguised it. Look at the difference. First he writes a G like this, and then he writes the G like that.

"Now, this is not on the check. This is on the specimen that he submitted. In his own *handwriting specimen he tried to go ahead and fool the Secret Service people by disguising his own handwriting.* So what makes you believe that his handwriting is going to be just positively on the checks? But good Lord, he had a stolen check. He had a stolen check in his hands. Three of them accord-

ing to this evidence. Do you think he is going to really sit down and write like he normally writes? This is what the expert is trying to tell you. And like he testified, many times you know that a person wrote document X and document B, and yet you know very often it's hard to really say that the same people wrote it, even when you know that they did after you compare the handwriting. Because People themselves do not write the same way all the time. Only if you write sufficiently enough are you able to pick up enough habit characteristics where you can honestly say that the same person wrote the instrument." (Emphasis added).

The finishing blow was administered at the close of the prosecutor's argument, finally drawing an objection, too little and too late:

"(A)nd don't you think for one minute we don't appreciate your attendance and you listening to this case. Because over and above Mrs. Hay and Mr. Librado Castillo and Mr. Maximo Garcia, believe me, there are many other people in this community that are receiving Social Security payments and benefits for the many hard years of labor that they put into this country and into the businesses that they worked with. And we do have to protect them against individuals young men, young men whose only credit to our society has been being arrested three times, twice for shoplifting and once for dangerous drugs.

"MR. ARDITTI: I object to that, Your Honor.

"MR. MARQUEZ: That's the evidence.

"MR. ARDITTI: Normally discharged veterans who have protected this country from evils outside its borders, Your Honor.

"THE COURT: I'll sustain the objection. I believe that's outside of the record.

"MR. MARQUEZ: All right, sir. But you've listened to the evidence. You have listened to all of the evidence. If he has protected my country, believe me, ladies and gentlemen, I know many other young men who have protected me. I have protected my country too. You have too when your time came. And I know many other young people who have protected their country, and they don't get involved in stealing checks, and they don't get involved and get arrested for shoplifting or the possession of dangerous drugs. Thank you, sir."

Immediately thereafter the trial judge, after denying a motion to dismiss the indictment for insufficiency of the evidence, the ruling thereon having been earlier reserved, proceeded with his jury instructions. No request was made for any sort of limiting instruction as to the effect of evidence of prior convictions, or directing the jury to disregard the prosecutor's inflammatory argument.

The prosecuting attorney's argument below is difficult to distinguish in harmful effect from the argument we found to constitute "plain error", even in the absence of objection, in United States v. Garber, 5 Cir. 1972, 471 F.2d 212, 217.

There, as here, it was improperly argued[6] to the defendant's prejudice that evidence of prior convictions showed the propensity or disposition of the defendant on trial to commit the offense charged. There, as here, the argument was reiterated and persisted in by the prosecutor, and similarly, no objection was voiced. Perhaps the prejudicial effect was greater in *Garber* because the prior convictions there were for violations of the Dyer Act and the charge on trial involved a like offense. But in *Garber* the trial judge at least gave the usual instruction that evidence of prior convictions is admissible only to impeach the defendant's credibility, although the *Garber* court characterized this as "too little and too late under the circumstances of this case", Id. at 217, and speculated that an immediate curative instruction might not have been effective, this doubt in itself serving to underscore the seriousness of the error.

The *Garber* court continued that we have applied the government's "harmless error" argument only where the evidence of guilt was exceptionally strong and the error appeared to have been harmless beyond a reasonable doubt,[7] citing Hoover v. Beto, 5 Cir. 1972, en banc, 467 F.2d 516, 538, and cogently observed:

"The question is not merely whether a mistake was made in applying technical rules of evidence but whether that mistake resulted in prejudicial error clearly affecting the substantial rights of the accused. Garber had a right to the benefit of the rule prohibiting the use of the prior convictions to prove that he committed this crime. The prosecutor's remarks were intended to influence the jury in a way that would deprive him of that right. Considering the evidence as a whole, we cannot be sure that the prosecutor was unsuccessful." Id. at page 217.

Whether the prejudicial argument here falls on the *Garber* side of the line or on the safe "harmless error" side of the line, exemplified by Hoover v. Beto, en banc, supra, Martin v. United States, 5 Cir. 1972, 453 F.2d 1370, is a very

---

6. The *Garber* case arose, as did the case here under submission, in the El Paso Division of the Western Division of Texas, but was tried before a different judge of that district.

7. This principle might in other circumstances, absent the additional infirmities in the conviction, permit affirmance of the conviction as to Counts 1, 2 and 3 and render consideration of the conviction under Counts 7, 8 and 9 unnecessary under the concurrent sentence doctrine, United States v. Vigo, 5 Cir. 1970, 435 F.2d 1347, inasmuch as the government's proof was "exceptionally strong" as to Counts 1, 2, and 3. We do not consider the doctrine available here.

close question indeed. This doubt is similar to the doubt expressed supra, Part III, as to the effect of the failure to charge on the presumption of innocence.

## V. THE SYNERGISM

But our doubts are resolved when we consider the prejudicial effect of the failure to charge on the presumption of innocence in combination with the prejudicial prosecutorial argument indulged in and largely uncorrected below. The synergistic [8] effect of the combination is fatal to the vitality of this conviction under the circumstances of this case.[9]

Fernandez was entitled to be tried with the benefit of the presumption of innocence. Instead he was required to undergo trial in the face of argument by a representative of the appellee, his government, which strove to impose what amounted in substance to a "presumption of guilt" arising from the undisputed evidence of prior convictions. "Plain error", necessitating reversal for new trial as to Counts 1, 2, 3, 7, 8 and 9 of the indictment, occurred below. That the jury returned a not guilty verdict as to Counts 4, 5 and 6 demonstrates the weakness of the government's proof as to those counts. It is in no wise a tribute to the fairness of its prosecutorial officer.

## VI. CONCLUSION

Inasmuch as the case is reversed for new trial, we do not consider the additional ground of error asserted, the insufficiency of the evidence below to support the conviction as to Counts 7, 8 and 9. The judgment of conviction appealed from is reversed and this case is remanded for further proceedings below.

8. See Webster's Third New International Dictionary of the English Language, Unabridged (1966) at p. 2320:
"Synergism: (1) . . .
(2) cooperative action of discrete agencies (as drugs or muscles) such that the total effect is *greater than the sum of the two or more effects taken independently—* opposed to antagonism.
. . . ." (Emphasis supplied).

9. We emphasize that our holding is limited to the peculiar combination of circumstances presented by this appeal.