GET OIL OUT! INC. et al., Appellants,

v.

EXXON CORPORATION et al., Appellees.

No. 75–3635.

United States Court of Appeals, Ninth Circuit.

Nov. 22, 1978.

John M. Sink, Santa Barbara, Cal., for appellants.

Edward J. Shawaker, Atty., Washington, D. C., Philip K. Verleger, Los Angeles, Cal., Denatus Januta, Deputy Atty. Gen. (argued), San Francisco, Cal., for appellees.

Before KENNEDY and HUG, Circuit Judges, and JAMESON,* District Judge.

KENNEDY, Circuit Judge:

This appeal requires a determination of whether certain off-shore facilities used to develop oil reserves lying beneath the ocean floor are "deepwater ports" as defined by the Deepwater Port Act of 1974, 33 U.S.C. § 1501 et seq. (1976). Get Oil Out! Inc. (GOO), a nonprofit California corporation, brought this action against the defendant oil companies to enjoin construction of the facilities in question until the defendants secured a license as provided by the Deepwater Port Act. The plaintiff also alleged that the environmental impact statement filed for the project was inadequate. The district court denied a preliminary injunction and granted summary judgment for the defendants on both issues. On appeal GOO does not contest the trial court's ruling that the environmental statement was adequate, but it does contend that the district court erred in ruling that the facilities proposed by the defendants are not regulated by the Act. We agree with the district court that the Deepwater Port Act does not apply to the facilities in question, and we affirm its judgment.

The installations at issue are proposed in connection with development of oil and gas reserves of off-shore lands covered by seventeen leases from the Department of Interior to the defendants Exxon Corporation, Shell Oil Company, and Standard Oil Company of California. Granted by authority of the Outer Continental Shelf Lands Act (OCS Lands Act), 43 U.S.C. §§ 1331–1343 (1970 & Supp. V 1975), the leases cover 83,037 acres of off-shore lands beyond the three-mile territorial limit of the State of California. The lands are located about twenty miles off the coast from the City of Santa Barbara.

In 1970 the lands were combined, with the approval of the United States Geological Survey (USGS), in an operating unit called the Santa Ynez Unit. Exxon, the major leaseowner, was designated as Unit Operator, with responsibility for managing and developing the unit lands. Exploratory drilling in the Santa Ynez Unit disclosed oil fields estimated by the USGS to contain reserves of 730 million to 1.1 billion barrels of oil, approximately one-fifth to one-third of the remaining crude oil reserves in the State of California and adjacent federal lands. The unit agreement required Exxon to submit to the USGS a plan for development of the fields, which Exxon did in April 1971. The USGS prepared an environmental impact statement evaluating Exxon's plan, and in August 1974 the Department of Interior approved the development plan and statement.

The development plan requires construction of a drilling platform approximately five miles off shore, from which twenty-eight wells can be slant drilled. The issue in this appeal, however, involves not the drilling platform but proposals for additional installations which would receive and store the oil and gas immediately after its production and facilitate its further shipment for refining. Two alternatives are contained in the development plan—the off-shore terminal, also referred to as Marine Loading Terminal or MLT, and the near-shore terminal. Appellant contends that the Deepwater Port Act would apply to whichever proposal is adopted.[1]

---

* Honorable William J. Jameson, United States District Judge for the District of Montana, sitting by designation.

1. The Deepwater Port Act provides in part:
   No person may engage in the ownership, construction, or operation of a deepwater port except in accordance with a license issued pursuant to this chapter. No person may transport or otherwise transfer any oil between a deepwater port and the United States unless such port has been so licensed and the license is in force. . . .
   33 U.S.C. § 1503(a) (1976).

The off-shore terminal, or MLT, presents the more difficult question on the appeal, and we therefore describe its design in detail. The MLT would be located 3.2 miles off shore, near the drilling platform. Oil and gas would flow from the drilling platform to a point below the MLT by a pipeline on the ocean floor. As proposed, the MLT facility consists of a single stem of connected equipment and mechanisms of diverse uses, rising from the ocean floor to the surface, and a floating vessel for treatment and storage. An installation called a base rests on the ocean floor. A universal joint is attached to the base, and from the joint a tubular riser extends upward to a point, still below the surface, where it meets with a mechanism called a fluid swivel. Degassed crude oil flows from the pipeline at the base through the tubular riser to the fluid swivel. From there the crude is conducted to the surface and to the floating storage and treatment vessel by means of a flexible hose, supported by small buoys. A mooring buoy on the water's surface is attached by a steel chain to a subsurface anchor swivel, which in turn is fixed in place by a chain and other connections to the fluid swivel and tubular riser installations. Thus the mooring buoy has downward extending equipment that joins the mechanisms rising from the base. The floating vessel ties to the mooring buoy. Small tankers, with a maximum size of 30,000 deadweight tons (dwt), secure alongside the vessel (and, it appears, to the mooring buoy also) to receive delivery of the oil for transport to refineries. The base and the upward structures it supports, the mooring buoy and the downward attachments that join it to the base supported equipment, and the floating vessel all comprise the MLT.

If the provisions and purposes of the Deepwater Act are to be reasonably construed with the statutes directing the Secretary of Interior to make provision for the development of oil and gas resources of the outer continental shelf beyond the territorial limit, we think it necessary to conclude that the MLT is not controlled by the Deepwater Port Act. We commence with a discussion of the Outer Continental Shelf Lands Act under which the Department of Interior acted in granting and regulating the oil and gas leases involved in the case.

The federal government has the right and responsibility to develop oil and gas reserves beyond the three-mile territorial limit on the lands of the outer continental shelf. Submerged Lands Act, 43 U.S.C. §§ 1301–1315 (1970); Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1343 (1970 & Supp. V 1975). The Secretary's duty is not limited to disposing of the government's proprietary ownership interest in outer continental shelf minerals. He has broad authority to prescribe rules binding on the operations of any lessee, for the protection of the natural resources of the outer continental shelf. 43 U.S.C. § 1334(a)(1). The statute provides that the jurisdiction of the federal law and the Secretary's authority applies

> to the subsoil and seabed of the outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources therefrom, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State.

43 U.S.C. § 1333(a)(1). *Cf. Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 355, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969) (purpose of OCS Lands Act was to define a body of law applicable to seabed and subsoil of OCS and to fixed structures, such as

---

Section 1502(10) defines "deepwater port" to mean:

any fixed or floating manmade structures other than a vessel, or any group of such structures, located beyond the territorial sea and off the coast of the United States and which are used or intended for use as a port or terminal for the loading or unloading and further handling of oil for transportation to any State, except as otherwise provided in section 1522 of this title. The term includes all associated components and equipment, including pipelines, pumping stations, service platforms, mooring buoys, and similar appurtenances to the extent they are located seaward of the high water mark.

drilling platforms thereon). The Secretary has promulgated regulations governing most aspects of the operation of OCS leases. See 30 C.F.R., Part 250 (1977) (Oil and Gas and Sulphur Operations in the Outer Continental Shelf). He has approved plans for transportation of oil from OCS leases by pipeline to shore and then by tanker to refineries, *see* 30 C.F.R. § 250.18(c)(1977), and the record shows that he has also approved oil shipments by barge from drilling platforms to shore. The Secretary is also charged under the OCS Lands Act with the responsibility for "conserving marine life, recreational potential, and aesthetic values, as well as the reserves of gas and oil." *Union Oil Co. v. Morton*, 512 F.2d 743, 749 (9th Cir. 1975); *Gulf Oil Co. v. Morton*, 493 F.2d 141, 144–46 (9th Cir. 1973) (interpreting 43 U.S.C. § 1334(a)(1)). These matters of statutory concern were considered extensively in the development plan and the environmental impact statement submitted to the Secretary and approved by him. Contrary to the arguments of appellants there will not be a serious gap in regulation with regard to the environmental and navigational safety elements of oil transportation from the OCS leases if the Deepwater Port Act is held inapplicable to such facilities.

■ Construction and operation of the MLT is an integral part of the facility for developing the mineral resources here in question. If the Deepwater Port Act were to apply to it, then other federal agencies and state officials could frustrate the Department of Interior's objective in executing the leases. It may be true, as the State of California argues, that an MLT is only one of several ways to transport oil from OCS leases, and thus the plaintiff's interpretation of the Deepwater Port Act might not thwart completely the Interior Department's goals. However, we see no mandate in the Deepwater Port Act for the degree of frustration which such an interpretation would entail. We do not accept an interpretation of the Deepwater Port Act which would render provisions of the OCS Lands Act ineffective. It is our obligation to so construe federal statutes so that they are consistent with each other, as

by this means congressional intent can be given its fullest expression. "[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976), *quoting Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

The extent to which application of the Deepwater Port Act would frustrate the lease arrangements and development plans approved by the Secretary of Interior is disclosed by a discussion of the substantive provisions and history of the Deepwater Port Act, and we turn to those subjects.

The licensing procedure contemplated by the Deepwater Port Act is difficult and time consuming. It requires cooperation not only of various departments and agencies within the federal government but also of the state or states concerned. A deepwater port license requires previous consultation by the Secretary of Transportation with the Secretary of the Interior, the Secretary of Commerce, the Secretary of State, and the Secretary of Defense, 33 U.S.C. § 1509(d)(1) (1976), and an opinion of the Federal Trade Commission and the Attorney General as to whether issuance of the license will have an adverse effect on competition, *id.* at § 1506. The Act requires approval of the deepwater port by the governor of any "adjacent coastal state," *id.* at § 1508(b)(1). In this regard the Senate Report stated:

> The Committees believe that any coastal State which chooses to forego benefits associated with deepwater ports to avoid potentially adverse environmental impacts should be allowed to veto the issuance of a license for deepwater port development off its shores. The Deepwater Port Act of 1974 creates this explicit veto power in section 4(c)(9) and section 9(b) because a State would not otherwise have such authority over a Federal license. Existence of this veto authority will not, in the opinion of the Committees, preclude the construction of deepwater ports since several States are actively

encouraging the construction of these facilities, notably States bordering the Pacific Ocean and the Gulf of Mexico. [1974] U.S.Code Cong. & Admin.News, pp. 7529, 7538. This veto power was thought tolerable by Congress because it was assumed that deepwater ports would be built somewhere regardless of the veto power of any single governor. However, as applied to OCS oil operation, the veto power contains a high potential for the frustration of federal lease policy since the location of production facilities is fixed by the existence of the reserves, and the state already has substantial authority to prevent oil from being taken ashore by pipeline. We do not think it was the intention of Congress to give states the power to control how oil acquired from OCS Lands Act leases would be transported, a function currently regulated by the OCS Lands Act.

The Act requires that the license be granted after selection is made from among competing deepwater port applications. See, 33 U.S.C. § 1504(d) (1976). If more than one application is submitted, priority is given first to an application by an adjacent state, then to an application by a person not engaged in producing, refining, or marketing oil, and, finally, to an application by any other person. *Id.* at § 1504(i)(2). We think it most unlikely that Congress wanted to prevent an OCS Lands Act lessee from owning or operating an essential facility for producing and transporting the crude oil to be extracted from the lease. That result alone would be a drastic change from current industry production concepts and from present Department of Interior policies. We are not persuaded by the argument that a license application for a deepwater port facility designed to service solely the operator of a mineral lease or group of leases would be likely to attract bids from that company only. Nothing in the record indicates that if mandated by law, construction of such a facility could not be profitable for an independent bidder. Nothing in the legislative history suggests an intention to use the Deepwater Port Act to effect such severe interference with industry practice or with the Department of Interior's policy to

require the operator of the unit area to have the direct responsibility and control of a reception and storage facility that is an integral part of the mineral production process.

Under the Act the Secretary may not authorize a deepwater port if the adjacent state is not making satisfactory progress toward developing a statewide coastal zone management program as required by the Coastal Zone Management Act of 1972. *Id.* at § 1503(c)(10). Without attempting to explore the full implications of this federal policy to encourage state compliance with federal statutes by depriving *the state* of an opportunity to have a deepwater port facility nearby, we note simply that Congress has used those means with reference to deepwater ports. It would be incongruous, therefore, to interpret the Deepwater Act as permitting a state to frustrate federal goals by denying to *OCS lessees* the right to develop plans approved by the Secretary of Interior.

Additional support for our conclusion that the Deepwater Port Act was not intended to apply to facilities like the MLT comes from those provisions of the Act pertaining to common carrier status and the prohibition of trade discrimination. A deepwater port is subject to regulation as a common carrier, in accordance with the Interstate Commerce Act, to the extent applicable. *Id.* at § 1507(a). Moreover, the licensee is required to accept, transport, or convey all oil delivered to the deepwater port without discrimination. *Id.* at § 1507(b). While we find it unnecessary to pass upon appellant's contention that the Secretary of Transportation has discretion to treat a specialized deepwater port as not being a common carrier, we doubt such discretion is vested in him. Discussing these two provisions, the Senate Report states, "This subsection requires, that, with respect to the transportation of oil, a deepwater port and any storage facilities directly served by a deepwater port must be regulated as common carriers by the Interstate Commerce Commission." [1974] U.S. Code Cong. & Admin.News, pp. 7529, 7573.

In any event, it is apparent from the legislative history that the common carrier provision was designed to guard against anticompetitive consequences not pertinent to the facilities here in question. *See id.* at 7540–42, 7573, 7614. This conclusion is reinforced by the provisions in the Act requiring favorable opinions on proposed deepwater ports from the Federal Trade Commission and the Attorney General. 33 U.S.C. § 1506 (1976). It was foreseen that since few deepwater ports would be constructed they could be competition bottlenecks if the owners discriminated unfairly among the users. That concern and the provisions which reflect it make little sense as applied to a facility serving a single OCS lease or unit area.

■ The irrelevance of principal provisions in the Deepwater Port Act to OCS Lands Act development is sufficient to justify our holding that the Deepwater Port Act does not apply to facilities designed exclusively for production and development of subjacent minerals. Examination of the background and history of the Act similarly supports our conclusion.

Appellant's interpretation of the Act seemingly requires deepwater port licenses for facilities that were operating in the Gulf of Mexico at the time the Act was adopted. The record in this case shows that during congressional consideration of the Act a common practice in handling oil produced from OCS leases off the coast of Louisiana was to keep it in storage facilities located beyond the three-mile limit and to transfer the oil to shuttle barges destined for on-shore treatment plants or refineries. The record in the trial court shows that approximately twenty such platforms in the Gulf of Mexico operated, and perhaps still operate, in this fashion, and that Congress and the agencies concerned with enactment of the Deepwater Port Act were aware of these operations. A statement in the congressional hearing that no deepwater ports existed in the United States is strong evidence that facilities like Exxon's MLT were not considered to be deepwater ports.

■ The stem of installations described at the outset of this opinion, see p. 728, *supra,* is sometimes described as a single anchor leg mooring system, or SALM. There is a suggestion in the congressional history that SALM systems probably would be used for deepwater ports. Appellants seize upon this to argue that the MLT proposed by Exxon is a deepwater port whereas facilities in the Gulf of Mexico, which do not use SALM, are not. The record support for appellant's statement that SALM is not used in the Gulf of Mexico is not entirely clear to us, but assuming it to be correct, it is of little consequence. We find nothing in the statute or legislative history to justify ruling that the definition of a deepwater port turns upon use of the SALM. That characteristic of a deepwater port is unrelated to the primary concerns of Congress in regulating such facilities.

■ The reference in the definition of deepwater port to a "port or terminal for the loading and unloading and further handling of oil" we think was intended primarily to cover facilities which, at the time of the consideration of the Act, had not yet been constructed anywhere off the coast of the United States. As of 1973, United States port facilities could not generally accommodate very large crude carriers, or supertankers, some of which range in size from 200,000 to 500,000 dwt. Congress studied the alternatives for accommodation of supertanker traffic. One was to dredge existing channels and ports to depths sufficient to permit the ships to enter. A second was to construct deepwater ports off shore in waters already deep enough to permit safe operation for supertankers.

■ The principal concern of Congress in enacting the Deepwater Port Act was to regulate facilities for general tanker and supertanker traffic, not to control facilities like the MLT proposed in this case. Appellants point to an earlier version of the Act which contained the following language:

> A high seas oil port, licensed pursuant to the provisions of this Act may not be utilized . . . for the transportation of minerals, including oil and gas, which

have been extracted from the subsoil of seabed of the Continental Shelf of the United States, in the coastal area in which the high seas oil port is located . . ..

They argue that congressional elimination of this provision shows an intent to include facilities pertinent to OCS Lands Act cases in the definition of deepwater ports. In light of the considerations discussed above we find this unpersuasive. We think the most reasonable explanation for the deletion of the passage is that Congress wanted to make it possible for the oil and gas mined from OCS leases to be shipped and transported from deepwater ports if licensed facilities existed, not that it intended to convert all facilities used for storing and transporting oil from OCS leases into deepwater ports.

Finally, we note that agencies and officials concerned with the instant case, whose views in interpreting the statute are entitled to substantial weight, *see, e. g., Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975); *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), are in agreement with our holding. It does not appear from the record that the Secretary of Transportation, who has primary responsibility for administering the Act, has taken a position in this litigation. However, the United States Coast Guard, a Department branch with extensive authority to administer the provisions of the Act, *see* 49 C.F.R. § 1.46(s) (1977), has expressed its views. A letter from the chief counsel of the Coast Guard is in the record of this proceeding and it states in part as follows:

It is my opinion that the Deepwater Port Act of 1974 was not intended to apply to the process of shipment of product from an offshore platform subject to the Outer Continental Shelf Lands Act. It is my opinion that the Deepwater Port Act was intended to deal with the offshore *transshipment* point and that the legislation was necessary simply because there was no way under the OCSLA to regulate deepwater ports unconnected with OCS activities. It is my opinion that there is no need to reach a strained interpretation that the DPA does cover certain OCS activities because there is ample authority in the OCSLA for the Coast Guard to regulate to the extent necessary the shipment of product from a production platform to shoreside facilities. Indeed, as you are aware, there are a number of permanently moored barges in the Gulf of Mexico on the U. S. continental shelf which function exactly in the manner that you intend to employ off Santa Barbara, and have done so for several years. Because of this fact, I do not believe that the Congress was unaware of the existence of such a practice, and I know that in the course of developing the administration bill on Deepwater Ports, this aspect was considered with the conclusion being that OCS activities properly were to be regulated under the OCSLA.

Letter from Rear Admiral R. A. Ratti, Chief Counsel, U. S. Coast Guard, to Judd Miller, Exxon Company, U. S. A. An opinion from the Solicitor of the Department of Interior reaches the same conclusion. These agencies have adopted a reasonable interpretation of the Deepwater Port Act and of OCS Lands Act. Their conclusion reinforces our construction of the two statutes.

■ In reliance upon the reasons above we hold that the definition of a deepwater port contained in the Deepwater Port Act does not include facilities used exclusively for production, transportation and storage of oil produced from adjacent OCS mineral leases, which constitute an incident of the lease development, and which are not intended to serve as a link in the nation's transportation network.

### The Near-Shore Alternative

In view of our holding as to the MLT, appellant's argument that the near-shore alternative proposed by Exxon is also a deepwater port need not detain us long. It is contended that the near-shore terminal

proposed has components and facilities which are located outside the three-mile limit, which render the entire facility a deepwater port. We find that interpretation of doubtful validity. We note that the principal elements of the near-shore alternative will be located inside the three-mile territorial limit. There is a strong argument that for that reason alone the Act would be inapplicable. In any event, it is unnecessary to make a definite ruling on the point, for even assuming that a near-shore terminal would be within the territorial jurisdiction of the Deepwater Port Act, our reasoning with reference to the MLT is fully applicable to the near-shore alternative.

The judgment of the district court is AF-FIRMED.