604 F.2d 1187
 13 ERC 1577, 9 Envtl. L. Rep. 20,661
 CA 79-3141 STATE OF CALIFORNIA and the California Coastal
Zone Conservation Commission, an agency of the
State of California, Plaintiffs-Appellees,
v.
Thomas S. KLEPPE, Secy. of Dept. Interior, etc., et al., Defendants,
and
Exxon Corporation, Defendant-Appellant.
STATE OF CALIFORNIA, etc., et al., Plaintiffs-Appellees,
v.
Thomas S. KLEPPE, etc., et al., Defendants,
and
Chevron U. S. A., Inc., Defendant-Appellant.
STATE OF CALIFORNIA, etc., et al., Plaintiffs-Appellees,
v.
Thomas S. KLEPPE, etc., et al., Defendants,
and
Shell Oil Company, Defendant-Appellant.
EXXON CORPORATION, Petitioner,
v.
The U. S. ENVIRONMENTAL PROTECTION AGENCY (EPA), etc.;
Douglas M. Costle, etc.; and Barbara Blum, etc.,
Respondents.
CHEVRON U. S. A., INC., Petitioner,
v.
U. S. ENVIRONMENTAL PROTECTION AGENCY (EPA), etc.; Douglas
M. Costle, etc.; and Barbara Blum, etc., Respondents.
 Nos. 78-2363, 78-2617, 78-2922, 78-1932 and 78-2277.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 20, 1979.
 
 Bryant C. Danner, Latham & Watkins, Los Angeles, Cal., on brief, for defendant-appellant; Philip K. Verleger, McCutchen, Black, Verleger & Shea, Los Angeles, Cal., Noble K. Gregory C. Douglas Floyd, Pillsbury, Madison & Sutro, San Francisco, Cal., argued.
 Angus MacBeth, Chief Pollution Control Section, Patrick J. Cafferty, Jr., Dept. of Justice, Washington, D. C. (argued), on brief, for plaintiffs-appellees; Donatas Januta, Deputy Atty. Gen., San Francisco, Cal., argued.
 Petition for Review of Final Determination of Environmental Protection Agency and Appeal from the United States District Court for the Central District of California.
 Before BROWNING and WALLACE, Circuit Judges, and BLUMENFELD,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 Exxon Corporation, Shell Oil Company, and Chevron U.S.A., Inc. (the oil companies) appeal from a district court ruling that it was without jurisdiction to review a determination of the Environmental Protection Agency (EPA) that portions of the Clean Air Act (CAA), as amended, 42 U.S.C.A. §§ 7401 Et seq. (West Supp.1979), should apply to certain activities on the Outer Continental Shelf (OCS). Exxon and Chevron have also filed petitions for review of the same EPA determination. We reverse the district court's ruling and remand the appealed cases for further proceedings; we dismiss the petitions for review.
 
 
 2
 * This controversy arises out of the oil companies' joint development of their oil and gas leases on the OCS, 3.2 miles off Santa Barbara County, California. Exxon operates the combined leases, known as the "Santa Ynez Unit." Under plans for development of the Unit, approved by the Department of the Interior, Exxon has constructed an offshore drilling and production platform (Platform Hondo). Exxon is currently pursuing one of two alternative plans for treatment of the oil produced.[1] This plan calls for construction of a floating offshore storage and treatment facility (OS&T) next to the platform.
 
 
 3
 In September 1976, the EPA requested information concerning estimated emissions from the OS&T. Exxon furnished the information but contested the EPA's jurisdiction over activities on the OCS. Subsequently, the EPA proposed conditions regulating air emissions from the OS&T as part of a draft water discharge permit to be issued by EPA pursuant to the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 Et seq. The water permit was ultimately issued without the air quality conditions. In correspondence beginning the latter part of 1977, however, the EPA claimed that the OS&T was subject to certain provisions of the CAA and stated that the OS&T required an air pollution permit under the CAA. Exxon maintained that the EPA had no jurisdiction over the OS& T. In January 1978, the EPA wrote Exxon that its prior determinations were tentative and that its deliberations on the matter were not yet complete.
 
 
 4
 In February 1978, the oil companies sought review of the EPA position by filing a motion for leave to file a counterclaim in a suit pending in the district court which the State of California had brought against the Department of the Interior and the oil companies to halt operation of the OS&T. The oil companies also sought leave to join the EPA as a party. The district judge denied the motion, ruling, among other things, that the counterclaim was not ripe. He further ruled that, if ripe, the EPA's determination was reviewable not by the district court but by either this court or the Court of Appeals for the District of Columbia Circuit.
 
 
 5
 On April 18, 1978, the EPA published in the Federal Register a "Notice of final determination of applicability" which concluded in part that the proposed installation of the OS&T is "subject to review under the new source review (NSR) and prevention of significant deterioration (PSD) provisions of the Clean Air Act . . . and EPA's implementing regulations." 43 Fed.Reg. 16393 (April 18, 1978) (citations omitted). The EPA concluded that portions of California's state implementation plan (SIP) for the maintenance of certain air quality standards, required by section 110 of the CAA, 42 U.S.C.A. § 7410 (West Supp.1979), should be applied to the platform, but that in the absence of EPA-approved NSR and PSD provisions in the California SIP, NSR and PSD standards promulgated by the EPA would apply. Id. at 16397. The oil companies again moved for leave to file a counterclaim and for a preliminary injunction. The district judge denied the motions, stating that although the issue was "ripe for immediate relief," it should be resolved in the court of appeals. The oil companies appealed.[2] In addition, Exxon and Chevron filed petitions for review of the EPA determination in this court, and Exxon, Chevron, and Shell filed petitions for review in the Court of Appeals for the District of Columbia Circuit. The EPA filed a motion to dismiss or transfer in the Exxon appeal and a motion to dismiss in the Chevron appeal. A motions panel of this court referred these motions to us for decision, and the Court of Appeals for the District of Columbia Circuit ordered that the petitions filed in its court be held in abeyance pending our determination of the motions to dismiss.[3]
 
 
 6
 In September 1978, Congress enacted extensive amendments to the Outer Continental Shelf Lands Act (OCSLA), among other things, directing the Secretary of the Interior (the Secretary) to prescribe regulations "for compliance with the national ambient air quality standards pursuant to the Clean Air Act." OCSLA § 5(a)(8), 43 U.S.C.A. § 1334(a)(8) (West Supp.1979). In response, the Department of the Interior published a notice of proposed rulemaking "to invite public participation in the identification and selection of a course of action . . . for the control of air emissions on the Outer Continental Shelf (OCS) that significantly affect the air quality of any State." 43 Fed.Reg. 60612 (Dec. 28, 1978). In May 1979, the Department announced public hearings and proposed revisions to 30 C.F.R. § 250 for oil and gas and sulphur operations in the OCS. 44 Fed.Reg. 27448, 27449 (May 10, 1979). With the factual setting complete, we now address the questions before us.
 
 II
 
 7
 We first examine our jurisdiction over these cases. While none of the parties has raised this issue, we observe that we properly have jurisdiction, pursuant to 28 U.S.C. § 1292(a)(1), over the appeals from the district court. The district court's June 7 ruling denied the oil companies leave to file a counterclaim and the preliminary and permanent injunctive relief sought. The court stated that jurisdiction lay not in the district court, but in the court of appeals. General Elec. Co. v. Marvel Rare Metals Co., 287 U.S. 430, 53 S.Ct. 202, 77 L.Ed. 408 (1932), held that the dismissal for lack of jurisdiction of a counterclaim that sought injunctive relief was appealable because the court in that case "necessarily decided that upon the facts alleged in the counterclaim defendants were not entitled to an injunction." Id. at 433, 53 S.Ct. at 204. In reliance upon General Electric, we have held that the denial of leave to file a counterclaim seeking an injunction is an appealable interlocutory order. In-a-Floor Safe Co. v. Diebold Safe & Lock Co., 91 F.2d 341, 342 (9th Cir. 1937). The Supreme Court recently stated that section 1292(a)(1) "does not embrace orders that have no direct or irreparable impact on the merits of the controversy," Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 482, 98 S.Ct. 2451, 2454, 57 L.Ed.2d 364 (1978), and, in the same opinion, characterized the order in General Electric as one which "entirely disposed of the defendant's prayer for injunctive relief." Id. at 481, 98 S.Ct. at 2454. Thus, In-a-Floor Safe Co. is still controlling in the circumstances presented by the appeals here, for the district court's asserted lack of jurisdiction in denying leave to file the counterclaim denied preliminary or permanent injunctive relief in any district court. Although the alleged claim was technically a proposed cross-claim with respect to the EPA, we think the reasoning applicable to this claim is the same as that which is applicable to the proposed counterclaim against California. The district court's order had the impact required by General Electric and Gardner.[4]
 
 
 8
 The central jurisdictional question here, however, involves two jurisdictional grants: one in the OCSLA, the other in the CAA. The oil companies claim that their appeals from the district court are based on the jurisdictional grant in section 23 of the OCSLA, 43 U.S.C.A. § 1349(b)(1) (West Supp.1979).[5] It states in part:
 
 
 9
 (T)he district courts of the United States shall have jurisdiction of cases and controversies arising out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed of the outer Continental Shelf . . . . Proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the State nearest the place the cause of action arose.
 
 
 10
 Exxon and Chevron claim that their petitions for review are based on the jurisdictional grant of section 307(b)(1) of the CAA, as amended, 42 U.S.C.A. § 7607(b)(1) (West Supp.1979), which specifies instances in which jurisdiction lies in the courts of appeals. This section states in part (footnote omitted):
 
 
 11
 A petition for review of (certain actions of the Administrator), or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action (pursuant to certain sections of the CAA) or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination.
 
 
 12
 The EPA, in urging us to stay the direct appeals and dismiss or transfer the petitions for review, argues that we should simply assume that section 7607(b) (1) is applicable and that the EPA's determination qualifies as a "final action" under that section, thus leaving for our determination only the question whether our circuit or the Court of Appeals for the District of Columbia Circuit should hear this case under that section. But we cannot so easily assume away questions crucial to the basis of our jurisdiction. Even were we to deal solely with the petitions for review, as the EPA suggests, the question whether a petition for review, rather than an action in the district court, is the proper course would, in our view, require initial resolution.
 
 
 13
 We begin our jurisdictional analysis by observing that a plain reading of section 1349 demonstrates that it applies in this case. The EPA argues, however, that the jurisdictional grant of the CAA applies exclusively to review of its determination, superseding the OCSLA grant. The oil companies assert, on the other hand, that section 1349 not only applies, but is the controlling jurisdictional grant. We might address this question by asking whether in this case the EPA's determination falls within the provisions of section 7607(b)(1), directing court of appeals review. If we were to conclude it did, we would be faced with concurrent jurisdictional grants, each directing action in a different court, and would have to decide which, if either, controls. But we believe that even an inquiry into the applicability of section 7607(b)(1) begs a more fundamental question of congressional intent: whether Congress intended that the latter jurisdictional grant could even potentially apply where section 1349 is implicated.[6] We believe the answer to this inquiry depends not so much on the precise language and legislative history of the grants themselves, but on the broader question of congressional intent with respect to the control of OCS air quality.[7] If EPA administration of OCS air quality control is inconsistent with that scheme, Congress could not have intended concurrent grants of jurisdiction with respect to regulation of such air quality and section 1349 alone applies.
 
 A.
 
 14
 We look first to the language of the 1978 amendments to the OCSLA. These amendments, which were the first major legislation to deal with the OCS since the initial enactment of the OCSLA in 1953, set forth a comprehensive scheme of regulation for the OCS. Congress stated, as part of its findings preceding those amendments, that "there presently exists a variety of technological, economic, environmental, administrative, and legal problems which tend to retard the development of the oil and natural gas reserves of the Outer Continental Shelf." OCSLA Amendments of 1978, § 101(8), 43 U.S.C.A. § 1801(8) (West Supp.1979). Language added to section 5 of the OCSLA, 43 U.S.C.A. § 1334 (West Supp.1979), by the 1978 amendments included:
 
 
 15
 (a) The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions. The Secretary may at any time prescribe and amend such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall, as of their effective date, apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter. In the enforcement of safety, environmental, and conservation laws and regulations, the Secretary shall cooperate with the relevant departments and agencies of the Federal Government and of the affected States. In the formulation and promulgation of regulations, the Secretary shall request and give due consideration to the views of the Attorney General with respect to matters which may affect competition. In considering any regulations and in preparing any such views, the Attorney General shall consult with the Federal Trade Commission. The regulations prescribed by the Secretary under this subsection shall include, but not be limited to, provisions
 
 
 16
 (8) for compliance with the national ambient air quality standards pursuant to the Clean Air Act, to the extent that activities authorized under this subchapter significantly affect the air quality of any State.
 
 
 17
 From this language it quite clearly appears that Congress gave the Secretary authority to promulgate air quality regulations for the OCS. The plain meaning provides no suggestion that such authority is to be shared. This reading is further supported by other portions of the amendments in which Congress clearly delineated the roles of agencies with potentially overlapping functions.[8]
 
 
 18
 We think simultaneous jurisdiction by the EPA over the OCS would impair or frustrate the authority which section 1334 grants to the Secretary. We need not compare all aspects of the EPA's determination and the Secretary's proposed rules. It suffices to observe that the EPA determined that SIPs are incorporated by the OCSLA and that the NSR and PSD provisions for certain districts in the California plan in this case, provisions promulgated by the EPA should apply to Platform Hondo. Thus, under the EPA's view, SIPs are the "basic mechanisms" for protecting United States air quality. 43 Fed.Reg. at 16397. In contrast, the rules proposed by the Secretary, though designed not to thwart the attainment of standards set by SIPs, do not originate in individual SIPs. Rather, they propose a regulatory scheme wholly independent of them. In addition, the Department's proposed rule notice acknowledged that the proposed regulations "rely heavily on standards, criteria and requirements established by the EPA," but stated further:
 
 
 19
 It was necessary, however, to deviate from EPA's standards, criteria and requirements in some instances. Unlike the sources of air pollutants located onshore, OCS sources are external to the onshore areas whose air quality they may affect and therefore the EPA procedures and criteria are not entirely applicable to the Department's mandate under the Act.
 
 
 20
 44 Fed.Reg. at 27450. The potential for conflict and confusion is clear. "It is our obligation to so construe federal statutes so that they are consistent with each other, as by this means congressional intent can be given its fullest expression." Get Oil Out! Inc. v. Exxon Corp., 586 F.2d 726, 729 (9th Cir. 1978). Under this analysis, we must conclude that EPA authority over OCS air quality control would be inconsistent with that provided to the Secretary, and that the jurisdictional provisions of section 7607(b)(1) therefore cannot apply.[9]
 
 B.
 
 21
 We are content that our interpretation based upon the statutory language is correct. We are aware, however, that "even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent." National R. R. Passenger Corp. v. National Ass'n of R. R. Passengers, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). But we can find nothing in the legislative history of the OCSLA which clearly shows either that Congress intended to limit the Secretary's authority in any way or contemplated dual jurisdiction.
 
 
 22
 In looking first to the OCSLA as originally enacted, it is clear that Congress expressed no concern over air quality on the OCS. In fact, the first major clean air legislation was not enacted until two years after the passage of the OCSLA. Thus, we must look to the 1978 amendments, enacted after the CAA, which set forth a comprehensive regulatory scheme for the OCS.
 
 
 23
 The Secretary's responsibilities with respect to OCS activities as they affect air quality were first outlined in the House version of the amendments, H.R. 1614;[10] the Senate version contained no comparable provision. The House report on these responsibilities made no mention of EPA jurisdiction over OCS activities. Rather, the report specified that the Secretary was to have responsibility for OCS air quality control, and stated that the Secretary was to "consult with" federal, state and local officials. Report by the Ad Hoc Select Comm. on the Outer Continental Shelf, H.R.Rep.No.95-590, 95th Cong., 1st Sess. 133 (1977), Reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 1450, 1539. Although the House report expressly indicated a desire to avoid bureaucratic conflicts[11] and suggested resolutions of such potential conflicts,[12] it was silent with respect to EPA jurisdiction over the OCS for control of air quality.[13]
 
 
 24
 In floor debate on H.R. 1614, Congressman Brown (Ohio) questioned the relationship between the EPA and the Secretary for purposes of the regulation of OCS air quality. Congressman Murphy, chairman of the Ad Hoc Select Committee, replied that the committee had been assured "that EPA does not have the authority to go offshore. . . . In the wisdom of the committee, the present H.R. 1614 gives the Secretary those air pollution control powers."[14]
 
 
 25
 Further colloquy several days later is consistent with the view that whatever the House contemplated with respect to application of the Clean Air Act itself, it intended that the Secretary control its administration on the OCS. At that time the proposed air quality provisions were amended to specify that the Secretary would promulgate regulations "(f)or compliance with the national ambient air quality standards or requirements pursuant to the Clean Air Act, to the extent that activities authorized under this Act affect the air quality of any state" and "for the establishment of air quality standards for operations on the outer Continental Shelf under this Act consistent with standards or requirements under the Clean Air Act." 124 Cong.Rec. H397, 415-16 (daily ed. Jan. 31, 1978). In an exchange with Congressman Rogers, Congressman Murphy confirmed that the Secretary was to "solicit and give due consideration to the views of the Administrator of the Environmental Protection Agency in developing his regulations." Id. at H416. While ultimately modified in the legislation as enacted, Quoted supra, this language would, at most, have specified which laws the Secretary was to implement on the OCS. Nothing indicates that the EPA administrator was to assert partial or total control over air quality administration on the OCS. While floor debates are entitled to less weight than committee reports, United States v. International Union UAW, 352 U.S. 567, 585-86, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); Accord, International Tel. & Tel. Corp. v. General Tel. & Elecs. Corp., 518 F.2d 913, 921 (9th Cir. 1975), Chairman Murphy's remark helps to confirm that the report was silent with respect to the EPA because the committee contemplated no EPA authority over OCS air quality.
 
 
 26
 The subsequent joint explanatory statement of the conference committee for the OCSLA amendments perhaps the strongest evidence of congressional intent outside the language of the statute itself also placed no apparent limits on the Secretary's regulatory authority over OCS air quality control. It specified in part that the Secretary was to promulgate regulations implementing 43 U.S.C.A. § 1334(a)(8) (West Supp.1979), and specified the use of Secretarial judgment in determining the effect of future OCS operations on air quality onshore. It also stated that the Secretary was to assure that offshore operations do not prevent attainment of state air quality standards, if state air quality is "significantly affected" by those operations. H.R.Rep.No.95-1474, 95th Cong., 2d Sess. 85 (1978), Reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 1674, 1684.[15]
 
 
 27
 Although the report of the conference committee did not limit the Secretary's OCS authority, it did state that it was aware of the EPA's April determination and that it did not intend to affect "whatever present authority the Environmental Protection Agency has in applying and enforcing the Clean Air Act." Id. at 86, (1978) U.S.Code Cong. & Admin.News at 1685.[16] While the committee clearly touched upon the problem before us, we cannot conclude that it resolved it.
 
 
 28
 We first observe that this language appears to be facially neutral. We further conclude that no other interpretation other than facial neutrality is satisfactory. Assuming we might have decided the extent of the EPA's authority differently prior to the 1978 amendments and viewed this statement as an invitation to retain whatever authority that might have been, we could not accept either of the possible results. If the EPA hypothetically had no OCS jurisdiction, the committee language reserves no EPA power at all, and is mere surplusage. On the other hand, if the EPA would have been able to make a better case for its authority before the amendments, this language at best implies that Congress contemplated partially or wholly concurrent authority over the OCS, leading to the danger that we might create bureaucratic conflicts without any assurance that Congress intended either our view of the EPA's pre-1978 status on the OCS or our retention of that status under the OCSLA as amended. We could not, on the basis of this reading of already uncertain language, insert a new agency into the cast of regulatory characters envisioned by the 1978 amendments. We can only conclude that although Congress had the opportunity to resolve directly the question before us, the language it chose in discussing the question can have no weight in its resolution.[17]
 
 
 29
 Comments by Senators Muskie and Jackson made prior to action on the conference committee report, not spoken in debate but printed in the Congressional Record, are the only evidence we have found of a contrary intent with respect to EPA jurisdiction, but are not of themselves sufficient to resolve the question in favor of the EPA. Senator Muskie appeared to believe both that the EPA has primary administrative authority on the OCS and that the Secretary's role is limited, 124 Cong.Rec. S13996-97 (daily ed. Aug. 22, 1978); Senator Jackson concurred.[18] These remarks, however, conflict with the House colloquy earlier discussed, which indicated just the opposite. They do carry weight because Senator Muskie identified himself as a "principal author" of the CAA, while Senator Jackson was both a member of the conference committee and chairman of the committee that submitted the amendments and report in the Senate. See City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 637, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). But these views, not spoken in debate, are obviously insufficient to form a clearly stated congressional intent to acknowledge EPA authority over air quality regulation of the OCS.
 
 
 30
 We conclude, therefore, that in the legislative history, Congress simply did not make its intent clear with respect to EPA administrative authority over OCS air quality except in its explicit statutory direction to the Secretary to assume this responsibility. Congress' consideration of EPA authority fails to provide a reliable resolution of the question before us. We are of the opinion that EPA authority would impair or frustrate the authority that the statute clearly provided to the Secretary. Thus we hold that Congress did not intend that the jurisdictional grants of the OCSLA and the CAA could stand together, and no jurisdictional conflict can arise.
 
 III
 
 31
 We now resolve the question of our jurisdiction. Because section 7607(b)(1) cannot apply, the petitions for review filed under that section must be dismissed. Section 1349 controls, and jurisdiction properly lay in the district court. We return the appealed cases to the district court for the appropriate resolution of the parties' claims consistent with this opinion.[19]
 
 
 32
 THE APPEALED CASES ARE REVERSED AND REMANDED; THE PETITIONS FOR REVIEW ARE DISMISSED.
 
 
 
 *
 Honorable M. Joseph Blumenfeld, United States District Judge, District of Connecticut, sitting by designation
 
 
 [1]
 Exxon originally pursued plans for an onshore facility but discontinued them when the California Coastal Zone Conservation Commission imposed certain conditions upon its construction. Events concerning the construction of this onshore facility are in part the basis for California's claims against the federal government and the oil companies in the original action pending in the district court
 
 
 [2]
 The district court's order on the first motion for leave to file a counterclaim was filed April 6, 1978. Following publication of the EPA's determination on April 18, Chevron, Exxon, and Shell filed a "Motion for Reconsideration; Supplemental and Renewed Motion for Leave to File Counterclaim; Supplemental and Renewed Motion for Preliminary Injunction" on April 28. The appeals from the court's June 7 ruling on the renewed motions were timely filed
 The oil companies' notices of appeal also state that they appeal from the April 6 order. They claim in the notices that the finality of the April 6 order was stayed by the April 28 motion for reconsideration. In light of our disposition on the basis of the June 7 ruling, we need not decide whether the appeal from the April 6 ruling was timely taken.
 
 
 [3]
 Exxon also sought an injunction during the pendency of the direct appeal and a stay during the pendency of the petition for review to enable it to continue construction of the OS&T. The motions panel denied these motions without prejudice to their renewal before us. Though they were renewed at oral argument, we did not rule on them then or during the submission of this case and they are now moot
 
 
 [4]
 The district court did not characterize the counterclaim as permissive or compulsory and neither need we. We think that where, as here, leave to file a counterclaim for injunctive relief, whether permissive or compulsory, is denied because the district judge concludes that relief is not available in any district court, the order falls within the scope of General Electric and Gardner and, hence, is appealable under section 1292(a)(1)
 
 
 [5]
 This section was added by the 1978 amendments to the OCSLA. Equivalent provisions were formerly found in section 4(b) of the OCSLA, 43 U.S.C. § 1333(b):
 The United States district courts shall have original jurisdiction of cases and controversies arising out of or in connection with any operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing or transporting by pipeline the natural resources, or involving rights to the natural resources of the subsoil and seabed of the outer Continental Shelf, and proceedings with respect to any such case or controversy may be instituted in the judicial district in which any defendant resides or may be found, or in the judicial district of the adjacent State nearest the place where the cause of action arose.
 For our purposes the differences are not material.
 
 
 [6]
 We would also arrive at this inquiry if we pursued the section 7607(b)(1) analysis first, found that section's requirements fulfilled, and were then faced with the same apparent jurisdictional conflict
 In addition, regardless of how we view the counterclaim and cross-claim for jurisdictional purposes, the inquiry remains the same. If the counterclaim requires no jurisdictional ground independent of that of the complaint because the counterclaim arises out of the same transaction or occurrence as the complaint, this will mean that section 1349 is implicated by the complaint as well. If the counterclaim requires an independent jurisdictional ground, section 1349 supplies that ground. If, as Federal Rule of Civil Procedure 13(g) requires, the cross-claim arises out of the same transaction or occurrence as the original action or the counterclaim, or relates to any property that is the subject matter of the original action, this again will mean that section 1349 is implicated by either the original action or the counterclaim.
 
 
 [7]
 By control or administration of "OCS air quality," we mean control of OCS activities insofar as they affect air quality
 
 
 [8]
 Section 22(c) of the OCSLA, 43 U.S.C.A. § 1348(c) (West Supp.1979), added by the 1978 amendments, states in part:
 (c) The Secretary and the Secretary of the Department in which the Coast Guard is operating shall individually, or jointly if they so agree, promulgate regulations to provide for
 (1) scheduled onsite inspection, at least once a year, of each facility on the outer Continental Shelf which is subject to any environmental or safety regulation promulgated pursuant to this subchapter, which inspection shall include all safety equipment designed to prevent or ameliorate blowouts, fires, spillages, or other major accidents; and
 (2) Periodic onsite inspection without advance notice to the operator of such facility to assure compliance with such environmental or safety regulations.
 New section 25(k), 43 U.S.C.A. § 1351(k) (West Supp.1979), states:
 (k) If any development and production plan submitted to the Secretary pursuant to this section provides for the production and transportation of natural gas, the lessee shall contemporaneously submit to the Federal Energy Regulatory Commission that portion of such plan which relates to production of natural gas and the facilities for transportation of natural gas. The Secretary and the Federal Energy Regulatory Commission shall agree as to which of them shall prepare an environmental impact statement pursuant to the National Environmental Policy Act of 1969 applicable to such portion of such plan, or conduct studies as to the effect on the environment of implementing it. Thereafter, the findings and recommendations by the agency preparing such environmental impact statement or conducting such studies pursuant to such agreement shall be adopted by the other agency, and such other agency shall not independently prepare another environmental impact statement or duplicate such studies with respect to such portion of such plan, but the Federal Energy Regulatory Commission, in connection with its review of an application for a certificate of public convenience and necessity applicable to such transportation facilities pursuant to section 717f of Title 15, may prepare such environmental studies or statement relevant to certification of such transportation facilities as have not been covered by an environmental impact statement or studies prepared by the Secretary. The Secretary, in consultation with the Federal Energy Regulatory Commission, shall promulgate rules to implement this subsection, but the Federal Energy Regulatory Commission shall retain sole authority with respect to rules and procedures applicable to the filing of any application with the Commission and to all aspects of the Commission's review of, and action on, any such application.
 
 
 [9]
 Though the Secretary's recent action clearly illustrates our point, we would reach the same conclusion had the Secretary not acted. The potential for conflict would exist in any event
 
 
 [10]
 Section 204 of H.R. 1614, which would have amended section 5 of the OCSLA, stated in part:
 The regulations prescribed by the Secretary under this subsection shall include, but not be limited to, provisions
 (8) for compliance with any standards established by a State pursuant to the Clean Air Act to the extent that activities authorized under this Act affect the air quality of such State; and
 (9) for the establishment of air quality standards for operations on the Outer Continental Shelf under this Act.
 Report by the Ad Hoc Select Comm. on the Outer Continental Shelf, H.R.Rep.No.95-590, 95th Cong., 1st Sess. 8-9 (1977).
 
 
 [11]
 The report stated that "(o)ne key function of H.R. 1614 is to provide for coordinated Federal action, by limiting duplication of effort, overregulation, and conflicting standards." Id. at 48, (1978) U.S.Code Cong. & Admin.News at 1455. See also id. at 158, (1978) U.S.Code Cong. & Admin.News at 1564
 
 
 [12]
 See id. at 133-34, 158, 201, (1978) U.S.Code Cong. & Admin.News at 1539-40, 1564, and 1606-07
 
 
 [13]
 In a background section discussing the "federal function" on the OCS, the report listed various agencies' responsibilities for OCS resource development. With respect to the EPA, it stated:
 EPA's role in OCS activities involve its being consulted on all National Environmental Protection Act studies and reviews and in having the authority to set and enforce discharge levels of pollutants. Hence, if EPA finds any BLM Environmental Impact Statement (EIS) is unsatisfactory, it can exercise its limited protest function and refer the matter to CEQ. Under the Federal Water Pollution Control Act Amendments of 1972, EPA must issue National Pollutant Discharge Elimination System permits for exploratory and development drilling if discharges are involved.
 Id. at 60, (1978) U.S.Code Cong. & Admin.News at 1467. No mention was made of EPA's role in the control of air pollutant emissions.
 
 
 [14]
 Mr. BROWN of Ohio. Mr. Chairman, I am concerned about a provision in H.R. 1614
 I understand that under the bill which the gentleman has authored, the Secretary of the Interior is required to promulgate and enforce regulations concerning the control of pollutants and emissions occurring on the OCS which affect onshore ambient air quality. In addition, the Secretary regulates the air quality above the Outer Continental Shelf.
 This seems to me to be a clear inroad into the responsibilities of EPA and will certainly, if it is not an inroad, lead to confusion as two arms of the Federal Government are regulating air quality.
 How is that going to be administrable? I do not understand that.
 Mr. MURPHY of New York. The chairman of the Subcommittee on Public Health, who has worked so closely with the gentleman from Ohio, has assured the committee that EPA does not have the authority to go offshore.
 We realize that we are dealing in the area of many very harmful pollutants because of the venting requirements on offshore platforms in this area.
 In the wisdom of the committee, the present H.R. 1614 gives the Secretary those air pollution control powers.
 
 
 [124]
 Cong.Rec. H314 (daily ed. Jan. 26, 1978)
 
 
 [15]
 The statement said in part:
 The Secretary of Interior is to promulgate regulations implementing this paragraph. The standards of applicability the conferees intended the Secretary to incorporate in such regulations is that when a determination is made that offshore operations may have or are having a significant effect on the air quality of an adjacent onshore area, and may prevent or are preventing the attainment or maintenance of the ambient air quality standards of such area, regulations are to be promulgated to assure that offshore operations conducted pursuant to this act do not prevent the attainment or maintenance of those standards. The terms "may have" and "may prevent" refer to the Secretarial judgment regarding future consideration of exploration plans, or development and production plans, in which the potential for "significant effect" is analyzed prior to approval and thus commencement of the proposed activities.
 The conferees agreed that if an approved State implementation plan has ambient air quality standards which are more stringent than the national ambient air quality standards, the Secretary of the Interior shall, with appropriate regulations, assure that offshore operations conducted pursuant to this act do not prevent the attainment of those State standards, if the air quality of that State is significantly affected by such offshore operations. These State standards and any national standards would not, however, apply to the quality of air above the OCS itself, or to OCS activities located in other parts of the country.
 The conferees' intent was that the regulations promulgated by the Secretary not generally require that the air mass above the OCS itself be brought into compliance with national or State ambient air quality standards but that regulations might be appropriate for the air above or near an artificial installation or other device (platform), so that emissions from such source is (sic) controlled to prevent a significant effect on the air quality of an adjacent onshore area.
 Other provisions in the conference report provide that exploration plans, and development and production plans, are to comply with any regulations promulgated pursuant to section 5(a)(8) of the amended OCS Act. Thus, in considering approval, modifications, and disapproval of a submitted exploration plan, or a development and production plan, the Secretary is to insure compliance with any applicable regulations promulgated, pursuant to section 5(a)(8).
 The conferees do not intend that the application of section 5(a)(8) regulations will interfere with the time periods provided in the conference report for review and approval of explorations plans, and development and production plans. The conferees expect that these regulations will be implemented consistently with the timetables established by these amendments.
 H.R.Rep.No.95-1474, 95th Cong., 2d Sess. 85-86 (1978), Reprinted in (1978) U.S.Code Cong. & Admin.News, pp. 1684-85.
 
 
 [16]
 The committee's statement said in part:
 The managers were aware that on April 13, 1978, the Environmental Protection Agency made a notice of determination that the Clean Air Act, as amended (42 U.S.C. sec. 7401 et seq.) and regulations promulgated thereunder, apply to activities on the Outer Continental Shelf when such activities could affect the air quality of an adjacent State.
 By their adoption of requirements for regulations for compliance with air quality standards, the conferees do not intend to supersede the Clean Air Act or the responsibilities of the EPA Administrator. There is no intent to affect, extend or reduce, whatever present authority the Environmental Protection Agency has in applying and enforcing the Clean Air Act, including the use of EPA's permitting authority.
 Specifically, the conferees intend that the Secretary of Interior shall be guided by the Clean Air Act, in consultation with the Environmental Protection Agency, in promulgating regulations to maintain consistency with ambient air quality standards, and its procedures establishing the technological means for controlling air emissions.
 H.R.Rep.No.95-1474, 95th Cong., 2d Sess. 86 (1978), Reprinted in (1978) U.S.Code Cong. & Admin.News at 1685.
 
 
 [17]
 The EPA also argues that "(t)he Congressional intent not to judge the EPA April 18 determination or rescind any of EPA's environmental responsibilities" is found in new section 21(d) of the OCSLA, 43 U.S.C.A. § 1347(d) (West Supp.1979). Section 21 pertains to safety and health regulations; subsection (d) states in part that "(n)othing in this subchapter shall affect . . . the authority provided by law to the Administrator of the Environmental Protection Agency for the protection of the environment." Apart from the problem that this language provides no better resolution of the question than that quoted Supra, the context and history of this clause show it did not arise from any concern over the EPA April 18 determination
 
 
 [18]
 The remarks stated in part:
 Mr. Muskie.
 In response to anticipated exploration off of the Southern California coast, EPA has issued a notice of determination that the Clean Air Act, and all regulations promulgated thereunder, apply to activities on the Outer Continental Shelf when such activities could affect the air quality of an adjacent State.
 All requirements under the Clean Air Act are thus applicable to OCS activities. This includes attainment and maintenance of ambient air quality standards when the State affected has not yet achieved those standards. It includes prevention of significant deterioration requirements when the State affected has air quality better than the ambient standards. It includes compliance with all new source performance standards promulgated by EPA which apply to an OCS facility. It includes compliance with all State air quality requirements authorized to be established by the Federal clean air law. It includes all permit requirements applicable prior to construction of a facility with a potential air quality impact on a State. It includes all enforcement authority required to be exercised by the Administrator of the Environmental Protection Agency.
 In short, exploration, development, and production activities on the Outer Continental Shelf are no different than any other source of pollution; they are regulated to the extent they interfere with the efforts of a State to comply with the Federal mandate to clean up its air or to keep its air clean, and to the extent EPA has promulgated new source standards for OCS activities. As one of the principal authors of the Clean Air Act, I can say that without question the law is intended to regulate any OCS activity which may affect the onshore air quality of a State, and EPA's notice of determination implements this congressional intent.
 Mr. President, the conference report on the Outer Continental Shelf Act contains language which in my opinion reinforces the Clean Air Act to activities on the Outer Continental Shelf.
 The bill requires that the Secretary of the Interior promulgate regulations to insure that exploration, development and production activities comply with "national ambient air quality standards pursuant to the Clean Air Act, to the extent that activities authorized under this act significantly affect the air quality of any State."
 The role of the Secretary is only to insure that exploration plans and development and production plans provide for compliance with all statutory requirements of the Clean Air Act, and regulations promulgated pursuant to it.
 The regulations of the Secretary of the Interior are in addition to the requirements under the Clean Air Act. They supplement the Clean Air Act; they are not a substitute for the Clean Air Act.
 Such provisions for compliance with the Clean Air Act are required in the plans whenever OCS activities may have a significant effect on an adjacent State's air quality, whether it is better or worse, than the ambient air quality standards. The determination of significant air quality effect will be made by the Environmental Protection Agency to fulfill its mandatory responsibility under the Clean Air Act. The Secretary will then carry out his duties under the Outer Continental Shelf Act based on EPA's air quality evaluation of proposed OCS activities.
 The Secretary's role is primarily in the nature of a procedural safeguard, not one of promulgating substantive clean air regulations or one of enforcement of the Clean Air Act. The Administrator of EPA retains responsibility for implementing the clean air law. Even if the Secretary fails to exercise his responsibility under the Outer Continental Shelf Act, the applicability and enforceability of the Clean Air Act is not affected.
 I would like to direct an inquiry to the distinguished chairman of the Energy Committee, (Mr. Jackson): Would the Senator describe the role of the Secretary as a supplemental one, to assure that provision is made for compliance with clean air requirements?
 Mr. JACKSON. Yes, the language of the Outer Continental Shelf Act is not intended to affect the present applicability of the Clean Air Act to OCS activities, or the primary responsibility of the EPA Administrator to enforce such requirements. The Secretary is expected to consult closely with EPA and to rely on its technical expertise when incorporating clean air requirements into exploration plans and development and production plans and when analyzing the air pollution impact of OCS activities.
 
 
 [124]
 Cong.Rec. S13996-97 (daily ed. Aug. 22, 1978)
 
 
 [19]
 The district court apparently viewed both the claims against California and the EPA as within the jurisdiction of the court of appeals. But assuming that the counterclaim against California could somehow fall within the terms of the jurisdictional provisions of the CAA, and would otherwise be reviewable in the court of appeals, our disposition necessarily precludes the application of that provision to the counterclaim against California as well as to the cross-claim against EPA in the circumstances presented by these cases
 We do not reach the arguments of California, as appellee, that the district court's ruling should be affirmed on grounds that the counterclaim failed to state a claim upon which relief could be granted against an "existing opposing party" in California's action; failed to state a claim arising out of the same transaction or occurrence as the complaint in that action; and failed to present any common controverted issues of fact or law. These were not raised in California's opposition to the new motion for leave to file a counterclaim and are not properly before us. We think the district judge should have the first opportunity to rule on these claims if they are properly raised.