UNITED STATES of America, Plaintiff,

v.

Laurence John LAYTON, Defendant.

No. CR–80–416 RFP.

United States District Court,
N. D. California.

March 6, 1981.

G. William Hunter, U. S. Atty., Stanford Svetcov and Robert L. Dondero, Asst. U. S. Attys., San Francisco, Cal., for plaintiff United States of America.

James F. Hewitt, Federal Public Defender, Frank O. Bell, Jr., Chief Asst. Fed. Public Defender, Tony Tamburello, San Francisco, Cal., for defendant Laurence John Layton.

## ORDER

PECKHAM, Chief Judge.

Laurence J. Layton, a.k.a. Larry Layton, has been indicted on four criminal counts arising from the events which occurred at the Port Kaituma airport in the nation of Guyana on November 18, 1978. Those events resulted in the death of Congressman Leo J. Ryan, then a member of the United States House of Representatives from the 11th Congressional District of California, and the wounding of Richard Dwyer, the Deputy Chief of Mission for the United States in the Republic of Guyana. The four counts of the indictment charge Mr. Layton with (1) conspiracy to murder a Congressman, under 18 U.S.C. § 351(d); (2) aiding and abetting in the murder of a Congressman, under 18 U.S.C. §§ 351(a), 2; (3) conspiracy to murder an internationally protected person, under 18 U.S.C. § 1117; and (4) aiding and abetting in the attempted murder of an internationally protected person, under 18 U.S.C. §§ 1116(a), 2.

 The defendant has moved for a dismissal of all of the counts of the indictment on various grounds. Many of those grounds were disposed of at a hearing held by this court on February 20, 1981.[1] The

---

1. Defendant's alternative grounds for dismissal of the indictment included the claim that the indictment was not properly returned within the provisions of 18 U.S.C. § 3238, that at least 12 of the grand jurors who voted for the indictment had to be shown to have attended all of the sessions of the grand jury, and that the indictment was not returned in open court, as required by Rule 6(f), Federal Rules of Criminal Procedure. The motion was denied as to these claims from the bench. As to the last stated claim, the court would not condone the manner in which this indictment was returned. The United States Attorney should not cause the

main contention pressed by defense counsel, however, is that this court lacks subject matter jurisdiction over these charges because the events on which these charges are based all occurred outside the territorial limits of the United States.[2] The court holds that there is proper subject matter jurisdiction over all the counts of the indictment and therefore denies the motion to dismiss for the reasons discussed below.[3]

Despite some suggestion by defense counsel that they questioned the constitutional authority of Congress to reach these crimes if committed outside the territorial boundaries of the United States, the courts of the United States have repeatedly upheld the power of Congress to attach extraterritorial effect to its penal statutes, particularly where they are being applied to citizens of the United States, as is the case in this instance. *Blackmer v. United States*, 284 U.S. 421, 437, 52 S.Ct. 252, 254, 76 L.Ed. 375 (1932); *United States v. King*, 552 F.2d 833, 850–51 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977),

and cases cited therein; *United States v. Baker*, 609 F.2d 134, 136 (5th Cir. 1980).

There are five principles under which the law of nations permits the exercise of criminal jurisdiction by a nation: *territorial*—jurisdiction based on the location where the alleged crime was committed, and including "objective" territorial jurisdiction, which allows countries to reach acts committed outside territorial limits but intended to produce, and producing, detrimental effects within the nation;[4] *nationality*—jurisdiction based on the nationality of the offender; *protective*—jurisdiction based on the protection of the interests and the integrity of the nation; *universality*—jurisdiction for certain crimes where custody of the offender is sufficient; and *passive personality*—jurisdiction based on the nationality of the victim. *Rivard v. United States*, 375 F.2d 882, 885 (5th Cir.), *cert. denied, sub nom., Groleau v. United States*, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967); *United States v. Rodriguez*, 182 F.Supp. 479, 487 (S.D.Cal.1960), *aff'd sub*

---

courtroom doors to be locked when an indictment is being returned, barring extraordinary circumstances. The need to have the indictment sealed is not sufficient grounds. Rule 6(e)(4) of the Federal Rules of Criminal Procedure allows the judge to seal an indictment and thereby prevent immediate disclosure of the names of those indicted and the nature of the charges; there is no need to bar the doors of the courtroom. Considering all the circumstances of this case, however, this court held that the locking of the courtroom doors is not sufficient grounds for dismissing the indictment. The defendant had also asserted in his moving papers that Count One did not properly charge a crime under 18 U.S.C. § 351. He did not press this assertion in his memorandum of points and authorities in support of his motion to dismiss. This assertion seemed to be aimed principally at raising the same concerns dealt with in the motions to strike portions of the indictment which were ruled on at the same hearing on February 20, 1981. In any case, this court finds that Count One of the indictment does charge an offense under 18 U.S.C. § 351, and the motion is denied as to that claim.

2. Count One of the indictment does allege that the conspiracy to kill Congressman Ryan charged therein took place both in Guyana and the Northern District of California. The only overt act listed in the indictment which did not take place in Guyana charges that "In the early part of November, 1978, Timothy Carter, a

member of Peoples Temple, traveled to the Northern District of California, and made contact with former members of Peoples Temple, some of whom were planning to visit Guyana with Congressman Leo J. Ryan." Timothy Carter is not a named co-conspirator in the indictment. Because of the result reached in this opinion, it is not necessary for the court to decide the issue of whether this allegation is sufficient to base jurisdiction for Count One on the claim that the conspiracy took place in part within the territorial limits of the United States.

3. At a hearing held on February 25, 1981, the court announced its holding on this issue and read a short summary of its reasoning. The court also announced at that time that this opinion would be forthcoming, which would state in greater detail and with fuller support the grounds for the court's decision. Although this court is not aware of any discrepancies, to the extent that there are any ambiguities or contradictions, it should be understood that this opinion, and not the oral summary delivered in court on February 25, represents the foundation for the court's holding.

4. *Strassheim v. Daily*, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911); *United States v. King, supra; United States v. Fernandez*, 496 F.2d 1294, 1296 (5th Cir. 1974).

*nom., Rocha v. United States*, 288 F.2d 545 (9th Cir.), *cert. denied*, 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961). The fact that Congress in the past may have favored or disfavored any particular ground for asserting extra-territorial jurisdiction is irrelevant to the consideration of Congress's constitutional power to assert that jurisdiction.

The mere fact that, in the past, Congress may not have seen fit to embody in legislation the full scope of its authorized powers is not a basis for now finding that those powers are lacking. Disuse, or even misuse of power inherent in the federal government, or given it by the Constitution, is not a valid basis for us to hold that this power may not later be employed in a proper manner.

*United States v. Rodriguez, supra*, 182 F.Supp. at 491; *accord, United States v. King, supra*, 552 F.2d at 851.

■ The power of Congress to authorize extra-territorial jurisdiction over the alleged crimes in this matter can be located in at least four of these principles—protective, territorial, passive personality and nationality jurisdiction. The alleged crimes certainly had a potentially adverse effect upon the security or governmental functions of the nation, thereby providing the basis for jurisdiction under the protective principle. *United States v. Pizzarusso*, 388 F.2d 8, 10–11 (2d Cir.), *cert. denied*, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968). The charges also suggest that the alleged offenses were intended to produce and did produce harmful effects within this nation, allowing a claim of jurisdiction under the "objective" territorial principle. The nationality of the alleged victims would also support an assertion of jurisdiction under the passive personality principle.[5] Finally, since Mr. Layton is a citizen of the United States, "American authority over [him] could be based upon the allegiance [he] owe[s] this country and its laws. . . ." *United States v. King, supra*, 552 F.2d at 851; *Blackmer v. United States, supra*, 284 U.S. at 437, 52 S.Ct. at 254; *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922); *United States v. Daniszewski*, 380 F.Supp. 113, 116 (E.D.N.Y. 1974). We therefore see no difficulty in upholding the authority of Congress, under the Constitution, to apply these statutes extra-territorially to the events charged in the indictment.

■ The question facing this court is one of statutory interpretation. For Congress did not explicitly state in any of the statutes relied on in this indictment that they were to apply extra-territorially, at least in the circumstances of this action. The issue then is whether it is proper to infer such an intent and to hold that extra-territorial jurisdiction is implicit in the respective statutes. We hold that such an inference is appropriate under each of the statutes in question.

A. *18 U.S.C. § 351—Conspiracy to Murder a Congressman; Aiding and Abetting in the Murder of a Congressman*

18 U.S.C. § 351 reads, in part,

(a) Whoever kills any individual who is a Member of Congress or a Member-of-Congress-elect shall be punished as provided by sections 1111 and 1112 of this title.

. . . . .

(d) If two or more persons conspire to kill or kidnap any individual designated in subsection (a) of this section and one or more of such persons do any act to effect

---

5. Passive personality jurisdiction is one of the bases for extra-territorial jurisdiction which is cited in the case law without any suggestion that it should not be relied upon by the courts. *Rivard v. United States, supra; United States v. Rodriguez, supra*. There are suggestions in some sources that the nationality of the victim, standing alone, is not sufficient basis for asserting extra-territorial jurisdiction. *See* Restatement 2d—Foreign Relations § 30(2) (1965);

*United States v. Columba-Colella*, 604 F.2d 356, 360 (5th Cir. 1979). Given that the assertion of passive personality jurisdiction does not stand alone in this case as the sole basis for extra-territorial jurisdiction under recognized principles of international law, the court need not address the question of whether Congress could assert its jurisdiction over a crime merely on the basis of the nationality of the victim.

the object of the conspiracy, each shall be punished (1) by imprisonment for any terms of years or for life or (2) by death or imprisonment for any terms or years or for life, if death results to such individual.

Count One of the indictment in this case charges Mr. Layton under 18 U.S.C. § 351(d) with conspiracy to kill Congressman Ryan, and Count Two of the indictment charges him with aiding and abetting in the murder of Congressman Ryan, under 18 U.S.C. §§ 351, 2.[6] The defendant asserts that this statute cannot be read to apply extra-territorially absent express Congressional intent. We disagree.

The starting point for any discussion about inferring extra-territorial jurisdiction under a criminal statute must begin with *United States v. Bowman*, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149 (1922). The analysis set forth by the Supreme Court in that case has been applied in every subsequent case where the issue has arisen. *See, e. g., United States v. Cotten*, 471 F.2d 744, 750–51 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *U.S. v. Mitchell*, 553 F.2d 996, 1002–05 (5th Cir. 1977). The critical distinction is drawn in *Bowman* as follows:

> The necessary locus [for application of a statute], when not specially defined, depends upon the purpose of Congress, as evinced by the description and nature of the crime, and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds which affect the peace and good order of the community, must, of course, be committed within the territorial juris-

diction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard . . . .

> But the same rule of interpretation should not be applied to criminal statutes, which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction or fraud, wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that, to limit their locus to the strictly territorial jurisdiction, would be greatly to curtail the scope and usefulness of the statute, and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

260 U.S. at 97–98, 43 S.Ct. at 40–41.

While it remains true that legislation of Congress is generally to be construed to apply only within the territorial jurisdiction of the United States, *Blackmer v. United States*, 284 U.S. 421, 437, 52 S.Ct. 252, 254, 76 L.Ed. 516 (1932), courts have not hesitated to invoke the language of *Bowman* in support of an inference of ex-

---

**6.** 18 U.S.C. § 2 states,

(a) Whoever commits an offense against the United States or aids, abets, counsels, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

No argument has been made that the fact that the charge in Counts Two and Three of the indictment are for aiding and abetting, rather than a direct charge of violating the substantive offense, would change the analysis of the applicability of these statutes to the extra-territorial events which form the basis of the indictment. In this court's opinion, moreover, no such argument would be warranted.

tra-territorial application where the purposes and nature of the statute appear to so warrant. Courts have generally inferred such jurisdiction for two types of statutes: (1) statutes which represent an effort by the government to protect itself against obstructions and frauds; and (2) statutes where the vulnerability of the United States outside its own territory to the occurrence of the prohibited conduct is sufficient, because of the nature of the offense, to infer reasonably that Congress meant to reach those extra-territorial acts. Because this court believes that the statute at issue here fits within both of those categories, an inference of extra-territorial application in the circumstances of this case is not only proper, but compelled.

Courts have generally inferred extra-territorial application for laws which represent an attempt by the government "to defend itself against obstruction or fraud . . . ." *Bowman v. United States, supra*, 260 U.S. at 98, 43 S.Ct. at 41. The Supreme Court has also stated that "a criminal statute dealing with acts that are directly injurious to the government, and are capable of perpetration without regard to particular locality, is to be construed as applicable to citizens of the United States upon the high seas or in a foreign country, though there be no express declaration to that effect." *Skiriotes v. Florida*, 313 U.S. 69, 73–74, 61 S.Ct. 924, 927–928, 85 L.Ed. 1193 (1941). On the basis of this reasoning, the Ninth Circuit inferred extra-territorial jurisdiction for theft of government property overseas, *United States v. Cotten, supra*, 471 F.2d at 750. The court there concluded that the theft statute in question "is a member of that class of proscriptions which is not logically dependent upon the locality of violation for jurisdiction, and therefore [we] give

it extra-territorial application at least where, as here, a citizen of this nation violates it while in a foreign country." *Id.* The Ninth Circuit similarly held that a section of the bankruptcy statutes relating to concealment of assets reached United States citizens outside of the territorial limits of the country, in part because "[t]hat section was enacted to serve important interests of government, not merely to protect individuals who might be harmed by the prohibited conduct." *Stegeman v. United States*, 425 F.2d 984, 986 (9th Cir.), *cert. denied*, 400 U.S. 837, 91 S.Ct. 74, 27 L.Ed.2d 70 (1970). And the Fifth Circuit had no trouble finding jurisdiction under the statute prohibiting possessing, forging and uttering stolen United States Treasury checks to reach actions which occurred exclusively in Mexico. *United States v. Fernandez*, 496 F.2d 1294 (5th Cir. 1974).

Certainly the Congress was addressing as important a problem threatening the integrity of the government when it moved to protect Congressmen from assault and murder as it was when it passed laws protecting government property, government checks, or bankruptcy proceedings, or as was the State of Florida when it passed legislation restricting the taking of commercial sponges.[7] As Senator Byrd stated on the floor of the Senate at the time of his introduction of the statute which became 18 U.S.C. § 351,[8]

> This legislation is needed to protect representative democracy. Passage would help guarantee the right of any Member of Congress to fulfill his constitutional duties and responsibilities as an elected official of our country.

116 Cong.Rec. 35655 (1970). The constitutional structure, and therefore the integrity of our nation, is more directly threatened by an attack on the elected representatives

---

7. This was the issue being addressed in *Skiriotes v. Florida, supra*.

8. The statute which became codified as 18 U.S.C. § 351 was originally considered and passed by the Senate as S. 642. Senate Report # 91–1249, 91st Cong., 2nd Sess. (1970); 116 Cong.Rec. 35654–58 (1970). It then was attached by the Senate as an amendment to the Omnibus Crime Control Act of 1970, P.L. 91–

644, 84 Stat. 1891 (1971) adopted by the Conference Committee in the final version of the legislation, passed both houses of Congress and was signed by the President in that form. *See* Conference Report # 91–1768, 91st Cong., 2nd Sess. (1970), *reprinted in* [1970] U.S.Code Cong. & Admin.News 5804, 5849; 116 Cong. Rec. 42147 (1970) (remarks of Senator McClellan).

of the people than it is by an attack on the property of the United States. It cannot be proper to consider the forgery of signatures on social security checks and the evasion of bankruptcy laws to be "directly injurious to the government," *Skiriotes v. Florida, supra*, but not to consider so an assault on the officials of one of the three branches of government established by the Constitution.

Nor is the danger to which this statute is addressed "logically dependent on the locality of the violation for jurisdiction," *United States v. Cotten, supra*, but reaches out to wherever a representative of the national government may travel, for an attack upon a member of Congress, wherever it occurs, equally threatens the free and proper functioning of the government. The concern of this statute is not simply with protecting the peace and order of the community, as with a normal murder, assault, or robbery statute; Congressmen were singled out for protection because of the position they hold in our constitutional government, because their protection is important to the integrity of the national government and therefore serves an important interest of the government itself. *Stegeman v. United States, supra.*

This is particularly true in this case, for Congressman Ryan traveled to Guyana as part of his duties as a member of the House Committee on Foreign Affairs and as a member of the International Operations Subcommittee. He did so, moreover, with the express approval of the chairman of that committee.[9] He also traveled to Guyana to fulfill his duties both as a representative of his constituents, some of whom had expressed concern to Congress about the conditions and events in the Jonestown settlement, and as a representative of other American citizens who had expressed similar concern.[10] These facts only make it clearer that the protection of Congressmen provided by 18 U.S.C. § 351 is designed to safeguard important interests of the government against obstruction and injury, and that therefore it is proper to give the statute extra-territorial application at least where, as here, a citizen of this nation allegedly violated while in a foreign country. *United States v. Cotten, supra.*

To limit this statute to violations within the territorial limits would also "greatly curtail the scope and usefulness of the statute and leave open a large immunity for [crimes] as easily committed by citizens . . . in foreign countries as at home." *United States v. Bowman, supra.* As with the Ninth Circuit's evaluation of the concealment provisions of the bankruptcy laws, to exclude here violations by citizens occurring outside the United States would frustrate in part the statute's purpose, by creating an obvious means of evasion. *Stegeman v. United States, supra*, 425 F.2d at 986. It is reasonable to infer extra-territorial jurisdiction from the fact that Congress was prohibiting conduct which, by its nature, could easily occur outside the territorial limits of the United States, as this and other circuit courts have done for laws punishing the making of false statements in visa applications. *.See United States v. Rodriguez*, 182 F.Supp. 479 (S.D.Cal.1960), aff'd sub nom., *Rocha v. United States*, 288 F.2d 545 (9th Cir.), cert. denied, 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961); *United States v. Pizzarusso*, 388 F.2d 8 (2d Cir.), cert. denied, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968).

Recent decades have seen Congress playing an increasingly active role in the formulation, implementation, and oversight of foreign affairs and international relations, and by necessity increasing international travel by legislators. This is particularly true of members of the foreign affairs committees of each house of Congress, but it is not limited to those committee members. For instance, increased trade in agriculture

9. *See* correspondence between Congressman Ryan and Chairman Zablocki, reprinted in *The Assassination of Representative Leo J. Ryan and the Jonestown, Guyana Tragedy*, Report of a Staff Investigative Group to the Committee on Foreign Affairs, H.Doc. # 223, 96th Cong., 1st Sess. at 43–48 (1979) (also issued as a Committee Print).

10. *Id.*, at 49–50.

**220**

and other commodities and an increased understanding of the role of commerce in foreign relations means that many members of Congress have the need to travel outside the territorial limits of the United States in the course of their official duties.[11] Given this widespread travel, to limit the scope of a statute designed to protect the lives and well-being of Congressmen to attacks within the territorial limits of the United States would greatly curtail the scope and usefulness of the statute, and create an obvious means of evasion. *United States v. Bowman, supra; Stegeman v. United States, supra.* It is reasonable to infer that Congress was well aware that its members, who were to be protected by this legislation, are often overseas, just as other courts have made similar inferences concerning Congress's knowledge of the presence overseas of government property, *United States v. Cotten, supra,* 471 F.2d at 750, and military units, *United States v. Birch,* 470 F.2d 808, 811 (4th Cir. 1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973) (applying extra-territorially statute prohibiting forgery of military passes). It is therefore also reasonable to infer that Congress meant to protect its members not only while in this country, but also when outside the territorial limits of the United States, at least when the attack is by a United States citizen and when the Congressman is acting in his or her official capacity. *United States v. Cotten, supra; United States v. Birch, supra.*[12]

■ In conclusion, either of these grounds standing alone would have been sufficient to support an inference of extra-territorial application for 18 U.S.C. § 351. The fact that both lend support compels this court to hold in favor of extra-territorial application, particularly in light of Mr. Layton's citizenship and the official nature of Congressman Ryan's trip to Guyana. The reasoning of federal courts in the past to infer extra-territorial jurisdiction for statutes covering theft of government property,[13] forgery of social security checks,[14] concealment of bankruptcy assets,[15] and solicitation and receipt of bribes[16] leads this court to believe that it would be a perversion of logic to extend jurisdiction over U.S. citizens who commit those crimes abroad and not apply this statute extra-territorially to a United States citizen accused of participation in the murder of a United

---

11. From 1968 to 1978, roughly half the members of Congress each year made trips overseas in their official capacities, with the number increasing over the years, from 210 in 1968 to 293 in 1978. The number of actual trips increased from 318 to 505; the amount officially spent increased from $980,000 to $2,220,000 over the decade. In 1970, the year the legislation was passed, 205 members of Congress made 291 trips abroad at a cost of $830,000; of this amount, $91,000 was attributed to trips made by members of the House Foreign Affairs Committee. The following year, 447 trips were made by 274 Congressmen, at a cost of $1,110,-000, with the House Foreign Affairs Committee spending $109,000 of that amount on travel. Congressman Ryan himself made three overseas trips in connection with his Foreign Affairs Committee work in 1978. Source: 37 *Congressional Quarterly Weekly Report,* at 1921–32 (1979); 30 *Congressional Quarterly Weekly Report,* at 1930–47 (1972).

12. The legislative history indicates that Congress considered 18 U.S.C. § 351 as part of the statutory scheme protecting the lives of the top officials of the three branches of government. 116 Cong.Rec. 35657 (remarks of Senator Griffin); Senate Report # 1249, 91st Cong., 2nd Sess., 2–8 (1970). The comprehensiveness of the statutory scheme addressed to this purpose also lends support for the extra-territorial application of 18 U.S.C. § 351. *See United States v. Baker,* 609 F.2d 134 (5th Cir. 1980) (broad sweep and purpose of Comprehensive Drug Abuse Prevention and Control Act of 1970, supports inference of extra-territorial application of sections lacking explicit grants of such jurisdiction); *Stegeman v. United States, supra,* 425 F.2d at 986 (in applying 18 U.S.C. § 152 extra-territorially, court relied in part on the fact that the section is part of the exercise of Congress's all-inclusive power to regulate bankruptcies).

13. *United States v. Cotten, supra.*

14. *United States v. Fernandez, supra.*

15. *Stegeman v. United States, supra.*

16. *Harlow v. United States,* 301 F.2d 361, 369–70 (5th Cir.), *cert. denied,* 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962) (discussion of proper venue; subject matter jurisdiction is apparently assumed).

States Congressman. The court therefore finds that the counts of the indictment in this case brought under 18 U.S.C. § 351 are properly within the subject matter jurisdiction of this court.

### B. *18 U.S.C. § 1116—Attempt to Murder an Internationally Protected Person*

 We now turn to the statute which provides the foundation for Counts Three and Four of the indictment.[17] 18 U.S.C. § 1116 makes it a crime to "kill[ ] or attempt[ ] to kill a foreign official, official guest, or internationally protected person . . . ."[18] This statute originally covered only foreign officials and official guests. The amendments which are crucial to our consideration became law in 1976. Those amendments added the term "internationally protected persons" to this section, as well as expanding the scope of 18 U.S.C. § 1116 and other sections of the United States Code.[19]

The defendant argues that the extra-territorial reach of this statute is limited to the circumstances for which such jurisdiction is explicitly spelled out in the code section. For unlike 18 U.S.C. § 351, 18 U.S.C. § 1116 does discuss extra-territorial application. Subsection (c) states, in part,

> If the victim of an offense under subsection (a) [quoted in part *supra*] is an internationally protected person, the United States may exercise jurisdiction over the offense if the alleged offender is present within the United States, irrespective of the place where the offense was committed or the nationality of the victim or the alleged offender.

Mr. Layton asserts that this language requires that the alleged offender be present within the territorial limits of the United States at the time of indictment in order for the statute to provide subject matter jurisdiction over events which occurred elsewhere. This would be, to refer to our earlier discussion,[20] an example of the application of the "universality" principle of jurisdiction, where, for certain crimes, the only necessary basis for jurisdiction is the presence of the accused in the prosecuting nation. Because Mr. Layton was not in the United States but in Guyana at the time when the indictment was returned, the defendant contends that the factual predicate which the Congress required for the assertion of extra-territorial jurisdiction did not exist and that therefore the indictment was invalid.

Despite the government's attempts to argue to the contrary, the language referring to the presence of the offender in the United States is not unrelated to the subject matter jurisdiction being granted in that subsection of the statute. If this court felt that the only basis for extra-territorial jurisdiction under this statute was located in the language of subsection (c), Counts Three and Four of the indictment would have to be dismissed.[21] But the court does not find that necessary, because the legislative history of this act makes it clear that the Congress also intended for jurisdiction to exist in the circumstances of this case.

 The legislative history of the amendments to 18 U.S.C. § 1116 with which we are here concerned makes it abundantly

---

17. Count Three of the indictment charges conspiracy to do those things made illegal by 18 U.S.C. § 1116, which conspiracy is made illegal under 18 U.S.C. § 1117. For reasons discussed *infra*, the court holds that the finding as to extra-territorial application of 18 U.S.C. § 1116 forms the basis for finding jurisdiction under 18 U.S.C. § 1117. Count Four of the indictment actually charges Mr. Layton with aiding and abetting in the attempt to murder Mr. Dwyer, which requires reading 18 U.S.C. § 1116 in conjunction with 18 U.S.C. § 2. This, however, has no effect on the analysis of the proper application of this statute to the events alleged in this case. *See* footnote 6, *supra*.

18. There is no dispute that Richard Dwyer falls within the definition of Internationally Protected Person. 18 U.S.C. § 1116(b)(4)(B).

19. *See* P.L. 94–467, 90 Stat. 1997 (1976).

20. *Supra*, pp. 215–216.

21. The court need not, and does not, reach the issue of whether, if those counts were dismissed, the government could then obtain a superceding indictment charging the same offenses, since Mr. Layton is now within the territorial limits of the United States.

clear that the intent of Congress was to pass the legislation necessary to fulfill the obligations of the United States under two treaties, an Organization of American States treaty entitled "Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion That Are of International Significance" and a United Nations-sponsored treaty, entitled "Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons" ("U.N. treaty"). This intent is stated repeatedly in the reports of the congressional committees which examined the legislation, see House Report # 94–1614, 94th Cong., 2nd Sess., at 1–2, reprinted in [1976] U.S. Code Cong. & Admin.News 4480, 4481; Senate Report # 94–1273, 94th Cong., 2nd Sess., at 5; 122 Cong.Rec. 32321 (1976) (remarks of Senator Hruska); 122 Cong.Rec. 31578 (1976) (remarks of Rep. Hungate).

Congress, moreover, clearly intended to enforce the obligations of the United States under the treaties completely. This is evident from the discussion in both of the Committee Reports, under the hearing "Need for Legislation":

> Even though the Senate has given its advice and consent to ratify both Conventions, the instruments of ratification have not been deposited and the United States is not yet a party to either. It is the policy of the State Department not to deposit an instrument of ratification unless it is assured that federal law will permit the United States fully to discharge its treaty obligations. Unless this legislation is enacted, the United States would not be able to fully discharge its obligations under the Conventions.

> The OAS Convention is presently in force, and the State Department expects the U.N. Convention to enter into force very shortly (only 6 more ratifications are needed). It is in the best interests of the United States to become a party to both. This legislation, if enacted, will permit the United States to deposit the instruments of ratification for both treaties and become a party to them.

House Report # 94–1614, supra, at 3, U.S. Code Cong. & Admin.News 1976, p. 4482 (footnote omitted); Senate Report # 94–1273, supra, at 6–7. Remarks to the same effect were made on the floor of each chamber of Congress by the respective principal spokesmen for the legislation. Representative Hungate stated in his remarks upon introducing the legislation onto the floor of the House,

> Even though it has signed both treaties, and the Senate has advised and consented to the ratification of both, the United States has not yet become a party to either the OAS or the U.N. Convention. The United States has withheld depositing the instruments of ratification until our Government could assure other countries that our federal law enabled us to meet all of our treaty obligations.

> Present Federal law, however, needs to be amended if our Government is to be able to give such an assurance. This legislation makes the changes necessary to enable our Government to meet its treaty obligations.

122 Cong.Rec. 31579 (1976). Remarks of a similar import were made by Senator Hruska on the floor of the Senate. See 122 Cong.Rec. 32321 (1976).

Given this oft-repeated, explicit intent to enforce fully the government's obligations under the treaties in question via these amendments to 18 U.S.C. § 1116, our attention now turns to the provisions of the United Nations treaty in question. Article 3 of that treaty states, in part,

> 1. Each State Party shall take such measures as may be necessary to establish its jurisdiction over the crimes set forth in article 2 [which includes the crimes presently subject to this discussion] in the following cases:

>> (a) when the crime is committed in the territory of that State or on board a ship or aircraft registered in that State;

>> (b) when the alleged offender is a national of that State;

>> (c) when the crime is committed against an internationally protected

*person ... who enjoys his status as such by virtue of functions which he exercises on behalf of that State.*

2. Each State Party shall likewise take such measures to establish jurisdiction over these crimes in cases where the alleged offender is present in its territory and it does not extradite him ... to any of the States mentioned in paragraph 1 of this article.

28 U.S.T. 1975, 1979, T.I.A.S. 8532 (emphasis added).

This language clearly states that the nations joining in this treaty were to have jurisdiction over crimes committed against internationally protected persons, including attempted murder, in four sets of circumstances: (1) when the crime was committed within the country in question; (2) when the alleged perpetrator is a national of that country; (3) when the victim is a representative of that country; and (4) even if none of the above are true, if the offender is caught in the country in question. In the last circumstance, this jurisdiction would allow the capturing nation either to try the alleged offender in its own courts, or to extradite the person to one of the nations which would have jurisdiction under the criteria laid out in the first three categories.

It is true that Congress only explicitly wrote into the statute jurisdiction under this last category, the requirement for which is found in paragraph 2 of Article 3 of the U.N. treaty. This, however, is not a completely inexplicable action. The other three bases for jurisdiction under the U.N. treaty—applying the territorial, nationality, and passive personality principles—are all tied to some aspect of the events which make up the alleged offense. The fourth kind of jurisdiction, while also based on a recognized principle of international law, "universality," is not grounded on any characteristics of the event itself, but on the location, at any time after the fact, of the alleged offender. This type of jurisdiction had its origins in the special problems and characteristics of piracy. It is only in recent times that nations have begun to extend this type of jurisdiction to other crimes, crimes considered in the modern era to be as great a threat to the well-being of the international community as piracy was in an earlier time and therefore properly included within this type of jurisdiction. *See Jurisdiction with Respect to Crime,* Draft Convention, with Comment, prepared by The Research In International Law of the Harvard Law School, (Supp. 29 *Amer.J. International L.* No. 3) (July 1935), at 563–92. The legislative history of this statute points out that similar jurisdiction had recently been extended by Congress over aircraft hijacking. House Report # 94–1614, *supra,* at 3; Senate Report # 94–1273, *supra,* at 6; 122 Cong.Rec. 32321 (1976) (remarks of Senator Hruska). It is not surprising, then, that Congress would explicitly write into this legislation the extension of this type of jurisdiction over another type of crime—terrorism—now considered by the international community to be deserving of treatment in a manner traditionally reserved for piracy.

■ This explicit grant in the statute of extra-territorial jurisdiction in the case of the fourth category of jurisdiction discussed in the treaty, therefore, does not counterdict the clear intent of Congress to pass legislation which would allow the United States to meet fully its treaty obligations, including the taking of jurisdiction over these crimes in the other three circumstances discussed in Article 3 of the U.N. treaty. This is not to say that there are not other difficulties raised by some comments made in the legislative history, or that every bit of evidence can be said to fully support this evaluation of the intent of Congress.[22] It is

---

22. House Report # 94–1614, *supra,* at 5, U.S. Code Cong. & Admin.News 1976, p. 4483, states, "[t]he legislation also amends section 1116 of title 18, United States Code, to authorize the United States to exercise extra-territorial jurisdiction over the offenses defined in section 1116 if the alleged offender is present within the United States." (Footnote omitted.) This language appears in the section-by-section analysis, which suggests that it is simply meant to restate the purposes of the explicit grant of jurisdiction in 18 U.S.C. § 1116(c). It does not appear to this court to provide sufficient basis for ignoring the evidence of congressional in-

**224**

seldom the case that the courts are faced with a completely unambiguous mosaic of information from which the intent of Congress emerges. But none of these other bits of evidence are sufficient, in this court's view, to overcome the clear congressional purpose to implement these treaties. Most importantly, there is no plausible explanation offered, nor does this court think there is any such explanation available, for why the Congress would state repeatedly that it intended to pass legislation to meet the obligations of the United States under these treaties, and then, without any comment or explanation at all, pass legislation which purposely avoided granting jurisdiction in two out of the four circumstances under which the United States was obligated to take jurisdiction by the terms of the treaty. A more reasonable reading of the statute, in the context of its purpose and origins, is that Congress intended to meet its obligation to take jurisdiction under each of the circumstances delineated in Article 3 of the U.N. treaty.

This court must give effect to congressional intent when such intent is discernable. *Sinclair Refining Co. v. Atkinson,* 370 U.S. 195, 215, 82 S.Ct. 1328, 1339, 8 L.Ed.2d 440 (1962). Thus, even the most basic principles of statutory construction must yield to clear contrary evidence of congressional intent. *National Railroad Passenger Corporation v. National Associa-*

*tion of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974); *State of California v. Kleppe,* 604 F.2d 1187, 1194 (9th Cir. 1979). " 'It is the duty of a court in construing a law to consider the circumstances under which it was passed and the object to be accomplished by it." *United States v. Curtis-Nevada Mines, Inc.,* 611 F.2d 1277, 1280–81 n.1 (9th Cir. 1980), *quoting United States v. Anderson,* 76 U.S. (9 Wall.) 56, 65–66, 19 L.Ed. 615 (1869). Therefore, even if this court believed that traditional maxims of statutory construction suggest that the clause explicitly granting extra-territorial jurisdiction in certain circumstances precluded inferring such jurisdiction in any other circumstances, this interpretation would have to be put aside in the face of the clear congressional intent to meet the obligations of the United States under the U.N. treaty. *National Railroad Passenger Corp. v. Nat. Assn. of Railroad Passengers, supra.*

This court's conclusion is buttressed by our earlier discussion of 18 U.S.C. § 351. 18 U.S.C. § 1116 is also concerned with protecting the integrity and vital interests of this nation, in the context of the threat of terrorism, which can by its nature strike out at the United States anywhere in the world. This is clear not only from the nature of the legislation and its congressional history, but from its impetus—these international treaties, designed to deal with

---

tent to enforce completely this country's treaty obligations.

Nor are there grounds for tipping the balance against the broader extra-territorial application of this statute in the example repeatedly used to describe the effect of the section explicitly granting extra-territorial jurisdiction when the offender is present in the country:

> For example, country A is a party to the Conventions. A citizen of country A kills the American Ambassador to his country. The offender then flees from country A to the United States, where he is apprehended. If the United States were a party to the Conventions, it would be obligated either to extradite the offender to country A or to try him under United States law.

House Report # 94–1614, *supra,* at 2, U.S.Code Cong. & Admin.News 1976, p. 4482; Senate Report # 94–1273, *supra,* at 6; 122 Cong.Rec. 32321 (1976) (remarks of Senator Hruska); 122

Cong.Rec. 31579 (1976) (remarks of Rep. Hungate). The ambiguity is caused by the fact that jurisdiction over the events in this hypothetical example would lie in our country under one of the sections of the treaty which we are holding was adopted by implication by the Congress, because the ambassador was a United States representative. *See* U.N. treaty, Article 3, ¶ 1(c), 28 U.S.T. at 1979. It therefore is not a good example of the extra-territorial jurisdiction embodied in the explicit clause of the statute, 18 U.S.C. § 1116(c), which allows the United States to try an alleged offender merely on the basis of his or her presence here no matter what his or her nationality, the nationality of the victim, or the location of the alleged offense. However, an ambiguity caused by a poorly chosen example is not grounds for ignoring the substantial evidence weighing in favor of the court's interpretation of Congress's intent.

a problem which nations throughout the world feel to be a threat to their integrity and which cannot be adequately dealt with within the confines of their own borders. Therefore, even the test of *United States v. Bowman, supra,* as it has been developed in the subsequent case law, discussed *supra,* reenforces rather than undermines the interpretation of 18 U.S.C. § 1116 which includes the extra-territorial application of the statute in all the circumstances discussed in Article 3 of the U.N. treaty.

▉ The application of this statute is particularly reasonable in the circumstances of this case. Not only was the attempt charged in the indictment made on the life of Richard Dwyer, an internationally protected person as a representative of the United States, but the accused offender is a citizen of the United States. Therefore, under either paragraph (1)(b) or (1)(c) of Article 3 of the U.N. treaty, the actions charged herein could be reached. Considering all of these factors, we hold that the count in this indictment brought under 18 U.S.C. § 1116 is properly within the subject matter jurisdiction of this court.

### C. *18 U.S.C. § 1117—Conspiracy to Violate 18 U.S.C. § 1116*

This court need not linger long over the defendant's separate arguments for dismissal of Count Three, charging violation of 18 U.S.C. § 1117. The statute states,

> If two or more persons conspire to violate section 1111, 1114 or 1116 of this title, and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any terms of years or for life.

▉ This statute is clearly one of general reference; the defendant does not argue to the contrary. As such, any subsequent amendments of the referred-to statute are properly read into the reference statute. *See* 2A Sutherland, Statutory Construction, §§ 51.07, 51.08 (4th Ed. 1973); *Director, Office of Workers' Compensation Programs, United States Dept. of Labor v. Peabody Coal Co.,* 554 F.2d 310, 322–31 (7th Cir. 1977); *Muenich v. United States,* 410 F.Supp. 944, 946–47 (N.D.Ind.1976).

Defense counsel instead argues that since the explicit grant of extra-territorial jurisdiction in 18 U.S.C. § 1116 refers only to subsection (a) of section 1116 and the extra-territorial provisions are not repeated in 18 U.S.C. § 1117, that code section cannot be applied extra-territorially. Even if this court was relying on the explicit grant of extra-territorial jurisdiction in 18 U.S.C. § 1116, the validity of this argument would be doubtful. Of course, this court has found that 18 U.S.C. § 1116 applies extra-territorially in other circumstances as well.

▉ This court has no doubt that the incorporation of 18 U.S.C. § 1116 by 18 U.S.C. § 1117 includes any explicit or implicit assertion of extra-territorial jurisdiction. The reference is complete, and there is no reason which this court can discern for suggesting that this incorporation by reference does not also include incorporation of the jurisdictional reach of the statute referred to. Moreover, courts, including this circuit, have regularly inferred extra-territorial reach of conspiracy statutes on the basis of a finding that the underlying substantive statute reached extra-territorial offenses, even though those conspiracy charges came under separate code sections. *E. g., Brulay v. United States,* 383 F.2d 345, 350 (9th Cir.), *cert. denied,* 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967) (18 U.S.C. § 545 extends extra-territorially, therefore 18 U.S.C. § 371, charging conspiracy, is extended along with it), *followed in United States v. Cotten,* 471 F.2d 744 (9th Cir.), *cert. denied,* 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973); *Rivard v. United States,* 375 F.2d 882, 887 (5th Cir.), *cert. denied, sub nom., Groleau v. United States,* 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967) (no distinction to be drawn, in examining the legitimacy of the assertion of extra-territorial jurisdiction, between a substantive offense and a conspiracy to commit the substantive offense); *United States v. Baker,* 609 F.2d 134, 136–39 (9th Cir. 1980) (court considered together the propriety of extra-territorial application of the substantive offense, 21 U.S.C. § 841(a)(1), and the

conspiracy offense for the same underlying actions, 21 U.S.C. § 846).

Based on both statutory interpretation of the relationship of these two code sections and the general inclination of courts to consider the application of conspiracy charges extra-territorially to follow the determination of the validity of the extra-territorial application of the underlying substantive statute, the court holds that the third count of the indictment brought in this case, under 18 U.S.C. § 1117, is also properly within the subject matter jurisdiction of this court.

SO ORDERED.